In the Matter of the Arbitration between STANDARDBRED OWNERS ASSOCIATION, INC., Petitioner, and YONKERS RACEWAY, INC., Respondent.

Supreme Court, Special Term, Nassau County, August 14, 1962.

*Jesse Moss* for petitioner. *Bleakley, Platt, Hart & Fritz* (*Louis Haimoff* of counsel), for respondent.

JOSEPH A. SUOZZI, J. This controversy arises out of an attempt by petitioner to enforce arbitration of a dispute between the parties. Respondent, resisting the application for appointment of an arbitrator, instituted an independent action in West-

chester County to declare the agreement between the parties (which provides for arbitration of disputes) in violation of the antitrust laws of the United States and of New York State. This court, GULOTTA, J., ordered a hearing to determine " whether the contract is void and unenforceable by reason of its alleged violation of the antitrust laws ".

Respondent contends that petitioner has functioned as an unlawful combination since 1953, and that its illegal activities coerced respondent into executing the agreement in issue. It is further contended by respondent that the agreement constitutes a price-fixing arrangement proscribed by section 1 of the Sherman Act (U. S. Code, tit. 15, § 1).

Petitioner (SOA) is a membership organization consisting of more than 1,000 owners, trainers and drivers of harness horses. Respondent (Yonkers) operates the Yonkers Raceway.

The agreement under consideration was executed April 16, 1958. It provides, *inter alia*, that certain fixed percentages of Yonkers' income shall be paid out as purses, and it further stabilizes and fixes the maximum purses to be paid for races in designated classes. Other provisions of the agreement include a health and welfare program, arbitration, scheduling and facilities, etc.

In June of 1957, almost a year before execution of the present contract, SOA struck Yonkers over a dispute involving the former's demand for increased purses. The SOA members, with some exceptions, refused to enter their horses for racing at Yonkers. SOA additionally sought, through advertising in a trade journal, to enlist the support of horse owners throughout the country to refrain from shipping any horses to Yonkers. The latter then instituted action against SOA in the United States District Court, Southern District of New York, for an injunction and damages for violation of sections 1 and 2 of the Sherman Act (U. S. Code, tit. 15, §§ 1, 2). A temporary injunction was sought enjoining SOA from failing in concert to enter horses at Yonkers and from refusing in concert to drive their horses in Yonkers' scheduled races.

The District Court ruled that the moving papers failed to establish that the refusal of the SOA members to enter their horses and race at Yonkers resulted from or evidenced " a combination or conspiracy to violate the anti-trust laws " (*Yonkers Raceway* v. *Standardbred Owners Assn.*, 153 F. Supp. 552, 557). The court did, however, rule that the efforts to induce horse owners to refrain from racing at Yonkers constituted an illegal boycott violative of the Sherman Act, and directed issuance of an injunction *pendente lite*.

When the agreement of April 16, 1958, was signed (following shortly upon the execution of a similar agreement with Roosevelt Raceway), the parties stipulated to the dismissal of the action in the Southern District Court with prejudice, and on April 28, 1958, that court entered an order dismissing Yonkers' action against SOA with prejudice.

It is not disputed that while violation of a Federal law cannot be urged as a basis for affirmative relief in a State court, it may nevertheless be asserted by way of defense to an action in a State court (*Remington Rand* v. *International Business Mach. Corp.*, 167 Misc. 108). It remains to be determined then whether the acts of which Yonkers complains violate the Federal antitrust statutes.

It is well settled that a unilateral refusal to deal, absent anything more, does not run afoul of the Sherman Act (*United States* v. *Colgate & Co.*, 250 U. S. 300). But group boycotts or concerted refusals to deal are held to be restraints of trade proscribed by law (*Times-Picayune* v. *United States*, 345 U. S. 594; *Klor's* v. *Broadway-Hale Stores*, 359 U. S. 207). There is nothing unlawful per se in a group of horse owners collectively negotiating with Yonkers as to its purse policy. It has, however, not been established that the individual members of SOA acted in pursuance of a combination or conspiracy. Moreover, the evidence presented does not rule out the conclusion that they separately reached a determination absent any agreement between themselves to do so.

Even though Yonkers has lived with this agreement for over three years, the doctrine of estoppel could not apply if, in fact, the agreement had been induced by and was the result of an unlawful combination. For public policy precludes enforcement of a contract violative of the antitrust laws and estoppel may not be invoked to thwart those statutes (*Sola Elec. Co.* v. *Jefferson Co.*, 317 U. S. 173). There is, however, a more serious question that appears to be dispositive of the boycott issue. When Yonkers' afore-mentioned action against SOA was dismissed *with prejudice*, the result was a judgment on the merits between the same parties and involving the same issues. It thus constitutes a bar to a later suit on the same cause of action (*Lawler* v. *National Screen Serv.*, 349 U. S. 322). This would not, of course, bar claims subsequently arising, but no subsequent issues are presented here.

There is therefore left for consideration the question whether the agreement fixes prices unlawfully. It is firmly established that a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing prices is illegal

per se (*United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150; *United States* v. *Masonite Corp.*, 316 U. S. 265; *United States* v. *Real Estate Bds.*, 339 U. S. 485). (An exception is found in various authorizing statutes known generally as " fair trade " laws.) It would be immaterial that the members of the price-fixing group were in no position to control the market. For to the extent that they raised, lowered or stabilized prices, they would be directly interfering with the free play of market forces (*United States* v. *Socony-Vacuum Oil Co.*, *supra*).

The rationale underlying this principle is found in the fact that price-fixing in any form is perhaps the most powerful inducement for the abandonment of competition. It offers security and stability; it eliminates much of the uncertainty of competitive practices; it offers the reward of high prices; it is most effective to regiment whole industries and to exact a monopoly price from the public. Through its exercise, the benefits to the public of competition disappear.

The element of commerce sufficient to satisfy the requirements of the Sherman Act is present here, for " The activities of harness racing are activities in interstate commerce in that the horses, in going from track to track, go across State lines " (*Yonkers Raceway* v. *Standardbred Owners Assn.*, *supra*, p. 554). The issue is thus stripped to its essence: Does the fixing and stabilizing of purses constitute price fixing?

There seems to be no controlling precedent applicable to the facts here presented. None of the cases cited or independently researched is precisely applicable. As far as I can determine, the situation is *sui generis*. I am unable to conclude that the agreement under consideration is illegal per se under the Sherman Act.

It is fundamental that " price " generally refers to some form of compensation in exchange for commodities or services. It cannot be considered therefore that a purse constitutes compensation for services, for the unsuccessful entrants in a race receive no compensation and the compensation that is distributed to the successful entrants is determined, not on the basis of a service rendered, but as a result of competitive activity between the participants. Actually, the purse represents a prize awarded for a degree of success rather than for the rendition of a specific service.

It is clear that the agreement is of substantial benefit to all horsemen racing at Yonkers whether or not they are members of SOA. In a sense, by advance agreement on purses, the horsemen to a certain extent eliminate competition between themselves. But such fact alone is not enough to condemn the agree-

ment (*Appalachian Coals* v. *United States,* 288 U. S. 344.) As the court there pointed out, there is no illegality per se in the selection of a common bargaining agency. In fact, such course is dictated by the circumstances peculiar to and the exigencies of the industry involved. It would be most impractical and, in fact, destructive to racing for each owner to bargain separately concerning the purse for each race.

The State of New York has determined through regulatory legislation (L. 1940, ch. 254, as amd.) that the public interest with respect to harness racing is best served not by untrammeled competition but by rigid regulation. Yet harness racing cannot achieve success and survive without substantial co-operation between the track and the horse owners. Such co-operation would hardly be compatible with the requirement that each individual owner negotiate separately with the track. Considering the number of races run daily, the aggregate number of horses entered and the necessity for advance programming, it must be obvious that the agreement in issue, rather than imposing an unreasonable restraint of trade, in fact fosters and promotes competition through its reasonable purpose to clearly define relations and obligations between track and owner. To that end, the agreement is of substantial benefit to both.

Accordingly, this court finds that the agreement under consideration does not violate the antitrust laws of this State or of the United States and, to that extent at least, is valid and enforcible.