Manja T. BRONNER, Plaintiff, Appellant,

v.

Arthur L. GOLDMAN et al., Appellees.

No. 6583.

United States Court of Appeals
First Circuit.

May 19, 1966.

Peter R. Tritsch, Boston, Mass., for appellant.

Henry M. Leen, Boston, Mass., with whom Thomas J. Carens and Roche & Leen, Boston, Mass., were on brief, for appellees.

Before ALDRICH, Chief Judge, and HASTIE * and McENTEE, Circuit Judges.

HASTIE, Circuit Judge.

This is a suit by the maker of a $184,-000 promissory note against the payee for cancellation of the note and for the value of securities posted as collateral and sold after the note became overdue.

The plaintiff is a business woman, the owner and operator of a substantial ladies' apparel retail business. The defendants are members of Roberts & Co., the payee of the note, a partnership engaged as a factor in the lending of money. The defendant Goldman is the managing partner and personally handled the transactions here in question.

Another principal in the venture, though not a party here, was Anton Homsey, a broker who was a member of the New York Stock Exchange and the managing general partner of the stock brokerage firm of du Pont Homsey & Co. For several years, before and after the transactions in suit, the plaintiff bought and sold stocks rather extensively through various brokers. In 1958, she became a customer of du Pont Homsey & Co., with Homsey acting as the firm's customer's man for her account. He also became her trusted friend and investment adviser.

Homsey also engaged in the purchase and sale of marketable securities for his own account. In this connection he borrowed sums of money from time to time from Roberts & Co., pledging stock certificates to secure the loans. In November, 1959 Homsey borrowed about $182,000 from Roberts & Co. and undertook to pledge 2,000 shares of American Motors common stock as security. A week later he gave the defendants a demand note for the amount he had borrowed. However, he had pledged only 1,000 shares of stock as collateral.

At the same time, earlier borrowings by Homsey from the defendants also remained unpaid, making his total indebtedness to the firm about $330,000. Concerned about Homsey's ability to repay the large sum, Goldman, the managing partner, suggested that Homsey get someone else to take over the recent transaction represented by the $182,000 loan.

To this end, Homsey turned to the plaintiff. She had traded profitably from time to time in American Motors stock. Moreover, on one occasion she had borrowed money to finance the purchase of stock in a profitable venture in association with Homsey. So, in the present case she acquiesced in Homsey's suggestion that she buy 2,000 shares of American Motors, financing the purchase through a loan secured by negotiable securities. It was agreed that they would share any trading gains equally, but plaintiff was to receive all dividends on the stock and Homsey agreed to save her harmless from any trading loss.

The transaction was carried out at a meeting of the plaintiff and Homsey with Goldman. On that occasion the plaintiff borrowed $184,000 from Roberts & Co., giving her note for that amount and promising to deliver 2,000 shares of American Motors plus other negotiable securities as collateral. Goldman then delivered to the plaintiff his firm's check for $184,000 which she endorsed to Homsey in payment for 2,000 shares of American Motors. After the plaintiff had left the meeting, Homsey in turn endorsed the check to the defendants in repayment of his most recent borrowing. During the meeting Goldman advised the plaintiff that he had already received 1,000 shares of American Motors as collateral and expected to receive the promised additional 1,000 in a few days. The prior receipt of 1,000 shares was also acknowledged in writing and 1,200 addi-

* Sitting by designation.

tional shares of American Motors were delivered to Roberts & Co. as collateral some weeks later.

Thereafter, for almost a year Homsey paid the interest due on the loan, more collateral was delivered to the defendants and all apparently went well. Then came Homsey's downfall. The New York Stock Exchange suspended him and his brokerage firm. He and his firm were forced into receivership and ultimately he was jailed for criminal misconduct in the operation of his business.

When Homsey defaulted, the defendants called upon the plaintiff for interest due on her $184,000 note. When she did not pay, the defendants called the note and disposed of the collateral much of which, particularly the American Motors stock, had declined substantially in value.

This suit followed. The district court found that the defendants had not wronged or injured the plaintiff and the plaintiff has now appealed from the court's judgment.

█ In the court below and upon this appeal the plaintiff has attempted at great length to show that she has been victimized by a fraudulent and conspiratorial scheme in which Homsey and the defendants joined. But the record does not substantiate this claim.

The plaintiff relies heavily upon the fact that Goldman suggested to Homsey that he have someone else take over the transaction involving the $182,000 loan. But the lender's desire to reduce its large holdings of Homsey's paper does not indicate that to it the American Motors speculation then appeared in any way improper or even to be a losing venture. Obviously, if American Motors stock had appreciated substantially in market value the venture would have yielded a capital gain, as the plaintiff anticipated in the light of her previous profitable experience in trading in this stock and in another venture in similar association with Homsey. Moreover, the terms of the venture were very favorable to her, even more favorable than her prior profitable venture with Homsey.

The plaintiff was lending her credit but contributing no capital other than the money borrowed. Homsey, apparently a reputable and successful financier, contracted to secure her against loss and to pay all interest on her borrowing. Her profit would be one half of any ultimate capital gain plus all dividends declared on the stock while she owned it. She could not lose so long as Homsey remained solvent. She had no reason to doubt that she was making a very good bargain and neither did Goldman, assuming he knew the details of the arrangements between Homsey and the plaintiff.

The only other circumstance said to indicate conspiracy is the failure of the defendants to inform the plaintiff that she was in effect taking over a stock purchase and a related borrowing already made by Homsey rather than making and financing a new purchase in the open market. But there was nothing to indicate to the defendants either that the plaintiff did not fully understand what was being done or that an open market purchase would be more advantageous than the acquisition actually made. We have already pointed out that the guarantee provided by Homsey made the actual transaction extraordinarily favorable to the plaintiff. In that respect, an open market purchase would have been less advantageous. And finally, the defendants did inform the plaintiff, both orally and in the agreement for the deposit of collateral, that 1,000 of the 2,000 shares primarily involved in the transaction had already been deposited with it. It is difficult to square this disclosure with any contention that the defendants were party to any concealment of the fact that Homsey already owned the stock.

█ The plaintiff makes a separate contention that the defendants have not fully accounted for or credited her with the proceeds of her collateral, particularly her American Motors stock. To begin with, the record establishes 2,200 shares as the amount of this stock pledged to the defendants. A two to one stock split while the pledge was in effect increased the number of shares to 6,600.

The defendants sold 6,000 shares and gave the plaintiff full credit for the proceeds. Homsey, whom plaintiff had authorized to handle the transaction, had been permitted to make a temporary withdrawal of some collateral. His subsequent redeposit failed to include 600 shares of American Motors. Accordingly, the defendants claimed and recovered the value of these shares in the Homsey receivership, and credited the plaintiff with the full amount. By taking bits of evidence, including answers to interrogatories, out of context, the plaintiff has sought to create the impression that additional American Motors stock was involved and not accounted for. In the view of the court below she failed in that endeavor and our own study of the record has led us to the same conclusion. There is simply no persuasive evidence that more than 2,200 shares of American Motors—6,600 after the stock split— were ever delivered to the defendants by or for the plaintiff.

■ We have not overlooked the claim that other stock belonging to the plaintiff and valued at $33,000 was wrongfully delivered to the defendants by Homsey as security for Homsey's own borrowings and, on liquidation, credited to Homsey. It is clear that the plaintiff entrusted this stock to Homsey as her agent with a stock power signed by her. Assuming her right to reimbursement for misappropriation of this stock can be extended beyond Homsey, the court below properly took into account that the New York Stock Exchange has paid the plaintiff $116,000 to compensate her for her broker's various defalcations. She has failed utterly to prove that this payment did not cover the items now in suit. A representative of the Stock Exchange testified in this case that the $116,000 payment covered these items. On the witness stand, the plaintiff herself, when asked whether this was not the fact, replied merely that she did not know.

■ In addition to the common law wrongs which we have discussed, the plaintiff complains that the defendants have violated provisions of the Securities Exchange Act of 1934. It is asserted that defendants' loans violated the margin requirements of Regulation T, 12 C.F.R. § 220, promulgated under authority of section 7 of the Securities Exchange Act, 15 U.S.C. § 78g. However, section 7(c) and the implementing regulation apply only to "any member of a national securities exchange or a broker or dealer who transacts a business in securities through the medium of any such member". The court below properly concluded that the defendants, a money lending partnership, were not such a broker or dealer. Regulation T, borrowing from section 3(a) (4) of the Act itself, 15 U.S.C. § 78c(a) (4), defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others * * *." It is true that in the course of its factoring business, the defendants accepted securities owned by borrowers as collateral. But their business was lending money and not trading in securities. When they sold or rehypothecated securities they did so in their own interest as a secured creditor and not in the course of trading for and in the interest of a client or customer. Thus, Roberts & Co. was not acting as a broker within the meaning of the statute and the regulation. See In the Matter of Sutro Bros. & Co., 1963, S.E.C. Release #7052, 1961–64 Decs. CCH Securities Law Reporter para. 76,913 at 81,382, 81,384; 2 Loss, Securities Regulations 1257. The only case cited by the plaintiff as supporting her position, S. E. C. v. Guild Films Co., 2d Cir. 1960, 279 F.2d 485, is an inapposite decision upon the meaning of the term "underwriters".

■ The plaintiff also seems to argue that the defendants have in some way violated section 7(d) of the Act, 15 U.S.C. § 78g(d), which makes unlawful any extension of credit by persons other than brokers and dealers for the purchase of securities in violation of credit restrictions imposed by the Federal Reserve Board. But the Board has not seen fit

to exercise its power by restricting any such extension of credit by a factor as we have here.

Separately, the plaintiff contends that the defendants violated the Securities Exchange Act by aiding and abetting a violation by Homsey. The plaintiff reasons that section 7(c) of the Act prohibits a broker from arranging credit for a customer except on terms which conform to the margin and credit requirements of Regulation T and that the defendants instigated and participated in Homsey's arrangement for the plaintiff to borrow money from them for the purpose of purchasing securities. This is said to make Roberts & Co. an aider and abettor of Homsey's violation of his duty as a broker. Therefore, reasons the plaintiff, the defendants are civilly liable for any damage the plaintiff suffered as a result of the transaction.

For present purposes we assume, but do not decide, that both Homsey's arrangement of the loan and the defendants' recommendation that Homsey follow such a course were violations of restrictions upon broker participation in such a transaction as this. However, we think it does not follow that the plaintiff is entitled to rescind the loan or recover damages from the defendants.

We start with the consideration that, as an extension of credit by a lender who was not a broker to a borrower seeking to finance a purchase of stock, the transaction between the defendants and the plaintiff was lawful. We have already shown that no fraud or conspiracy was involved and that the proscriptions of Regulation T are inapplicable. We find no other relevant prohibition. Thus, the alleged wrong of the defendants was merely in causing Homsey's participation as a broker in an otherwise proper transaction between a lender and a borrower. The law reflects a strong policy against a broker playing a role in such a loan, not a policy of invalidating force against

the credit transaction itself. We think effect should and can be given to both the policy permitting the loan itself and the policy proscribing broker participation in it. The validity of the loan can be recognized by denying the borrower as against the lender any such recision or damages as this action seeks. On the other hand, the policy against broker arrangement of otherwise proper loans can be enforced through the various administrative disciplinary sanctions provided by the Act, or by injunctive relief or even criminal prosecution as such sanctions may be applicable in particular circumstances to a broker[1] or anyone who aids and abets his misconduct. See e. g. In the Matter of Sutro Bros. & Co., supra. Cf. Associated Securities Corp. v. S. E. C., 10th Cir. 1961, 293 F.2d 738; S. E. C. v. Timetrust Inc., N.D.Cal.1939, 28 F.Supp. 34.

In urging that the civil remedies of recision and damages should be available to her against the defendants because they aided and abetted Homsey's arrangements of the loan, the plaintiff relies principally upon Remar v. Clayton Securities Corp., D.Mass.1949, 81 F.Supp. 1014. But that decision turns upon the existence of the very circumstance, the absence of which here impedes the plaintiff's claim. In *Remar* a broker arranged for an extension of credit by a bank to the plaintiff. In the circumstances of that case, different from the present case, the bank loan itself was within the category of credit transactions prohibited by the Federal Reserve Board. Thus, in the view of the court, the broker who arranged and thus caused the independently illegal loan could properly be required to respond in damages for injury the borrower suffered through the illegal transaction. Here the loan was lawful and we see no reason to give the borrower civil relief from the consequences of her bargain as if the extension of credit had been unlawful or the lender had taken some advantage of her.

[1] We find it unnecessary to consider whether sufficient basis exists for giving a borrower a right to recover damages against his broker who has violated Regulation T by arranging a valid unregulated factor loan for him.

The appellant has argued several additional points. We have considered all of them and conclude that they do not demonstrate any reversible error.

The judgment is affirmed.