Stanley S. PEARLSTEIN, Plaintiff-Appellant,

v.

SCUDDER & GERMAN, a Partnership, Defendant-Appellee.

No. 92, Docket 33315.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1969.

Decided July 2, 1970.

Joseph Tiefenbrun, Henry Conan Caron, New York City, of counsel, for appellant.

Myron S. Isaacs, Hellerstein, Rosier & Rembar, New York City, for appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

WATERMAN, Circuit Judge:

Appellant Stanley S. Pearlstein, the plaintiff below, sued Scudder & German, a partnership engaged in the securities business, for damages which he alleged he suffered because the defendant had violated the margin and antifraud provisions of the federal securities laws.[1] Plaintiff's allegations grew out of two

---

1. Section 7(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78g(c) states:

§ 78g *Margin requirements*

   *     *     *     *     *

(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium of any such member, directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) On any security (other than an exempted security) registered on a national securities exchange, in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section.

Regulation T of the Federal Reserve System, 12 C.F.R. § 220.4(c) (2) promulgated pursuant to 15 U.S.C. § 78g (a), reads in part:

In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor shall, except as

distinct purchases of bonds he bought through the defendant, who acted as his broker. Although these transactions overlapped in time they can best be described separately. The first of these, which can be termed the "Lionel transaction," began on March 6, 1961, when plaintiff bought fifty convertible bonds of the Lionel Corporation for a total price of $59,625.41 despite defendant's advice against the purchase. Plaintiff financed this purchase partly through a bank loan of $48,000 arranged by the defendant against the bonds and partly through a payment to defendant of $4,598.53 in cash. These two payments fell short of the purchase price by $7,026.88, however, and plaintiff continued to owe this balance to the defendant. Under Federal Reserve System Regulations[2] the payment of this sum was due on March 15, 1961, seven business days after the date of purchase. Plaintiff did not pay any portion of this balance by that day. As payment had been delayed beyond the permissible time, defendant was obligated by law to sell the bonds on plaintiff's account. However, defendant made no such sale but, instead, on April 5, transferred the bonds to the lending bank as security for its loan and did not even demand of the plaintiff payment of the balance due until June 8. Finally, on August 7, plaintiff was served with a summons in a suit instituted by defendant to collect this sum.

At about this time plaintiff must have developed serious doubts as to the legality of his debt to defendant, both in this transaction and in that described below. He consulted a lawyer concerning the matter, and on August 8 he visited the Securities and Exchange Commission, the New York Stock Exchange, and the National Association of Security Deal-

ers. He was everywhere told that his obligation was valid. The following day, August 9, plaintiff entered into a stipulation of settlement in the suit defendant had commenced, promising to pay the sum he owed in two installments on August 11 and September 20, 1961. Plaintiff made both payments on schedule. The bank which held the bonds as security for its loan to plaintiff eventually sold them in three lots on May 11 and May 18, 1962, and April 19, 1963, for a total price of $33,159.14. Thus Pearlstein suffered a total loss of $26,466.27 on his purchase of Lionel bonds.

The second or "AMF" transaction germane to this lawsuit involves the purchase by plaintiff, on a "when issued" basis, of 100 convertible bonds of the American Machine and Foundry Company ("AMF"). Once again plaintiff made the purchase contrary to defendant's advice, at a total price of $150,082.64. Defendant had a short position in these bonds and told plaintiff that it could furnish him his bonds upon their issuance by AMF in the near future from this short position. Plaintiff agreed. The bonds became available for purchase on March 23, 1961 and payment under Regulation T should have been made April 4. Although payment was not made by that date defendant did not demand payment of any part of the total sales price until May 22, 1961. After various subsequent requests for payment were ineffectual defendant threatened plaintiff with legal action in August. On August 9, 1961, the same day that Pearlstein entered into the stipulation of settlement respecting the Lionel bonds, the parties entered into an agreement with regard to the AMF bonds as well. The agreement provided that defendant would attempt to arrange

provided in sub-paragraphs (3)–(7) of this paragraph, promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof.

The seven days referred to above refer to seven full business days, 12 C.F.R. § 220.4(c) (7).

The antifraud provisions cited by plaintiff are Section 17(a) of the Securities Exchange Act of 1933, 15 U.S.C. § 77q(a) (1)–(3), Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(a) &(b), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 10b–5.

2. Regulation T, *supra* note 1.

a bank loan of $100,000 secured by the bonds, and Pearlstein would pay the defendant the additional $50,000 himself in two equal installments on August 11 and November 8, 1961. The bank loan was accordingly arranged for and Pearlstein made the first payment of $25,000 on August 11 as scheduled. However, he was unable to meet the November 8 payment and he obtained an extension from defendant until February 8, 1962. In return for this extension plaintiff signed a confession of judgment in a suit the defendant had commenced against him that same day. This document provided that defendant could obtain a judgment against plaintiff for the debt owed without further notice to him. Plaintiff failed to make payment on February 8, 1962, and, pursuant to the confession, judgment was accordingly entered against him in the Supreme Court of New York for $22,712.81, a sum reflecting adjustments for several payments made by plaintiff on the one hand and for interest and costs accruing to defendant on the other. Eventually the lending bank sold the AMF bonds on May 29, 1962, at a price which caused plaintiff to suffer a total loss of $59,000 on the AMF transaction.

After he had begun the present lawsuit in the federal court below plaintiff sought to reopen the New York judgment of $22,712.81 which defendant had obtained. The New York judge, Hecht, J., dismissed his motion, suggesting that plaintiff's remedy, if any, lay in the federal courts. Pearlstein did not appeal.

Plaintiff was hospitalized for surgery on two occasions during these transactions. The lower court found, however, that plaintiff's ill health did not affect his capacity to understand and evaluate his business dealings.

In the instant case Pearlstein sought to recover from defendant the difference between the amounts he would have received for the Lionel and AMF bonds if defendant had sold them on his account on the day payment was due and the amounts actually received when the banks sold the bonds much later. In seeking these damages plaintiff alleged not only that defendant had violated the securities laws, but also that it had committed fraud. The court below held that plaintiff had standing to sue for damages under Section 7(c) of the Securities Exchange Act of 1934 and that defendant had violated both this section and Regulation T of the Federal Reserve System. However, the court also held that plaintiff was bound by the stipulations of settlement he had entered into with defendant in both transactions and that the judgment entered in the AMF transaction amounted to *res judicata*. The court also held that plaintiff had not been treated fraudulently.

We agree with the district judge below that defendant violated the federal securities laws by extending credit to the plaintiff and that Pearlstein has a right of action against the defendant. We disagree, however, with the holding that the stipulations of settlement and the New York judgment in the AMF transaction bar this suit. Accordingly, we reverse and remand for further proceedings consistent with the approach taken in this opinion.

At the outset we express reservations as to the legality of the size of the loans, up to two thirds of the value of the bonds, which defendant procured for plaintiff—a matter quite distinct from the length of time defendant extended credit to plaintiff. It appears from our own examination of the relevant law [3] that in 1961 a broker could not legitimately arrange a loan for the purchase of securities, secured by those same securities, for more than 30% of their value. The parties have not raised this issue, however, and for that reason we do not deal with it except to call the matter to the attention of the parties and of the district court on remand.

In regard to Regulation T, upon which the plaintiff bases this suit, it seems reasonably clear that defendant

---

3. See 12 C.F.R. §§ 220.2(b), 220.3(b), and 220.8(a); Warshow v. H. Hentz & Co., 199 F. Supp. 581 (SDNY 1961).

violated federal law when it failed in each instance to sell the bonds after seven business days had expired without payment. No reason appears why such a sale could not easily have been accomplished in the case of the AMF bonds, either by repurchase on the part of the defendant, who had sold plaintiff the bonds from its own short position, or by resale to third parties. The Lionel bonds present a somewhat more difficult problem, in that a loan secured by the bonds had been arranged by the defendant at the outset of the transaction, and defendant was under an obligation to transfer the bonds to the bank when the loan was executed. The record does not divulge whether title to the securities was also to pass to the bank at the time the loan was made. However, in any event, it appears that whereas payment on the bonds was due from plaintiff on March 15, 1961, defendant did not deliver the bonds to the bank or receive the proceeds of the loan from the bank until April 5. At the time payment was due, therefore, any contract of the plaintiff with the bank was still executory, and it lay within the power of defendant to refuse delivery of the bonds, thus cancelling the loan agreement and creating in its place a liability in Pearlstein for whatever portion of the bank's expected interest the bank might require in damages.[4] Brokers have been held in violation of the margin requirements when they arranged illegal bank loans as well as when they extended credit themselves,[5] and we think an equal duty exists to take reasonable steps to prevent (at no risk to the broker) the execution of a transaction which has become illegal subsequent to the arrangement of a loan to finance it.

We also hold that Pearlstein has a right of action against Scudder & German for its violation of Section 7. Although the congressional committee report which recommended the enactment of Section 7 indicates that the protection of individual investors was a purpose only incidental to the protection of the overall economy from excessive speculation,[6] it has been recognized in numerous cases since that time that private actions by market investors are a highly effective means of protecting the economy as a whole from margin violations by brokers and dealers.[7]

The defendant asserts that these cases limit investor recovery to those situations where the broker has deliberately and wilfully induced the investor to buy securities on the assurance of an unlawful extension of credit. Here, defendant submits, it was the plaintiff who fraudulently induced the broker to enter into these transactions. Pearlstein was knowledgeable in the securities field, and defendant attributes to him a conscious plan to profit from the illegal extension of credit if the bonds increased

4. Under New York law, a party to a contract who renders its performance illegal by his own fault appears to be liable for breach. See Dolman v. United States Trust Co., 206 Misc. 929, 134 N.Y.S.2d 508, 511, aff'd, 1 A.D.2d 809, 148 N.Y.S. 2d 809, rev'd on other grounds, 2 N.Y.2d 110, 157 N.Y.S.2d 537, 138 N.E.2d 784; Restatement of Contracts §§ 457, 458.

5. See Bronner v. Goldman, 361 F.2d 759 (1 Cir.), cert. denied, 385 U.S. 933, 87 S.Ct. 295, 17 L.Ed.2d 214 (1966); Warshow v. H. Hentz & Co., 199 F.Supp. 581 (SDNY 1961); Remar v. Clayton Securities Corp., 81 F.Supp. 1014 (D.Mass. 1949).

6. Report of the House Committee on Interstate & Foreign Commerce, H.R. Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934). See Note, Federal Margin Requirements as a Basis for Civil Liability, 66 Colum. L.Rev. 1462, 1470–1471 (1966).

7. See, e. g., Junger v. Hertz, Neumark & Warner, 426 F.2d 805 (2 Cir. 1970); Smith v. Bear, 237 F.2d 79, 87–88 (2 Cir. 1956); Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (SDNY 1968), aff'd mem. 409 F.2d 1360 (2 Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969); Moscarelli v. Stamm, 288 F.Supp. 453 (EDNY 1968); Glickman v. Schweickart & Co., 242 F. Supp. 670 (SDNY 1965); Cooper v. North Jersey Trust Co., 226 F.Supp. 972 (SDNY 1964); Remar v. Clayton Securities Corp., 81 F.Supp. 1014 (D.Mass. 1949).

in price and to sue the defendant for damages if their prices declined.

■ In our view, defendant's statement of the law is incorrect. The federal securities laws charge brokers and dealers with knowledge of the margin requirements and with the duty to obey them. No broker can conscientiously claim to have been misled into extending credit beyond the seven-day limit absent some misstatement of fact by his customer regarding the customer's use of the money loaned, see A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2 Cir. 1967), a circumstance which is not present here.

Whether Pearlstein also knew of the margin requirements is unclear in the absence of some specific finding on that point by the lower court, although his unfruitful trips to the Securities and Exchange Commission and the New York Stock Exchange several months after the commencement of these transactions would seem to indicate that he may have been merely suspicious as to the illegality of the credit given him. However, our holding does not turn on Pearlstein's subjective knowledge of the law. In our view the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission.[8] As the district court observed in Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 87–90 (SDNY 1968), aff'd mem., 409 F.2d 1360 (2 Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218 (1969), the defense of *in pari delic-*

*to* in securities law cases has been undermined by the recent antitrust case of Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). There the Court held that the doctrine of *in pari delicto* would not bar a retailer from suing a manufacturer for antitrust violations when the retailer had been coerced into joining the illegal agreement.

■ Although *Perma Life* would apparently continue to deny recovery to plaintiffs who had not been coerced but who had benefited from the arrangement equally with the defendant, such a defense does not appear desirable in the securities area here involved, even when the investor may be shown to have had knowledge of margin requirements. Unlike the antitrust laws which forbid both seller and buyer to enter into a proscribed transaction, the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit. This fact appears to indicate that Congress has placed the responsibility for observing margins on the broker, for the original need for margin requirements undoubtedly derived from the common desire of investors to speculate unwisely on credit. Moreover, whereas brokers are charged by law with knowledge of the margin requirements, the extent of an investor's knowledge of these rules would frequently be difficult of tangible proof.

The cases cited by defendant need not be read to contradict this view of the law.[9] Although two of them do indicate that certain kinds of contributory fault

---

8. Cf. J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

9. Several cases cited by defendant deal not with the investor's right to recover for the broker's failure to sell unpaid-for securities after seven days, but rather with the broker's right to sue for the original contract price after plaintiff has failed to tender payment and the broker has accordingly sold the securities on the inves-

tor's account. See A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2 Cir. 1967); Billings Associates, Inc. v. Bashaw, 27 A.D. 2d 124, 276 N.Y.S.2d 446 (1967); E. F. Hutton & Co. v. Weinberg. 1961–64 CCH Sec.L.Rep. ¶ 91.332 (Sup.Ct. N.Y. 1964); Irving Weis & Co. v. Offenberger, 31 Misc.2d 628, 220 N.Y.S.2d 1001 (Mun.Ct. 1961). Pearlstein does not contest his liability for the original contract price, but rather seeks to limit his loss to that which he would have sustained had de-

may bar suit against a broker in this context,[10] the kinds of contributory fault there involved go beyond knowledge of the margin requirements to concealment or misstatement of material facts. Consequently we decline either to follow or to attack these holdings.

We next turn to the lower court's holdings that plaintiff's suit is barred by the stipulations of settlement which he entered into with defendant and by the judgment entered in the AMF transaction in the New York Supreme Court. As to the settlements, the court below recognized that a simple agreement between the parties that plaintiff would pay if defendant extended further credit would be void under Section 29(a) and (b) as a contract made in violation of the rule against extension of credit. However, in both transactions involved here, defendant had commenced lawsuits before plaintiff signed a stipulation of settlement in the Lionel matter and a confession of judgment in the AMF suit. The court held that these agreements served to settle the actions, that they did not continue illegal credit but served as a "fresh start" in the relationship of the parties, and that to hold otherwise "seemingly leads to the untenable result that it would never be possible to settle issues arising from violation of the credit and margin regulations and that all such controversies would have to be litigated." 295 F.Supp. at 1204.

We disagree with this logic. First, we hold that the settlements did involve the promise by defendant of a continuation of credit which was illegal under the Act. Defendant argues that because it had already delivered the bonds to the lending banks in each transaction, it could not have sold them even if it had wanted to, and therefore did not extend any more credit than it already had extended. However, defendant should have used its best efforts to secure the return of the bonds which it had improperly delivered to the banks, by replevin if necessary, and to sell them. Defendant's failure to take such action resulted in a continuation of credit in violation of Regulation T, and under Section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), the stipulation is void.

Even apart from the continuing ability of Scudder & German to liquidate the bonds on plaintiff's account, we think that the stipulations do not bar this suit. Assuming that plaintiff and defendant both believed that it was impossible for defendant to sell the bonds after their delivery to the bank, the plaintiff's primary motive to enter into the stipulation was undoubtedly the desire to gain enough time to meet his debt, thus avoiding an immediate judgment which might precipitate his bankruptcy or at least cause him serious financial strain. Nevertheless, it was defendant's very

---

fendant sold the bonds after seven days. Other cases cited by defendant are also inapposite. In Moscarelli v. Stamm, 288 F.Supp. 453 (EDNY 1968), the court denied plaintiff's motion for summary judgment because plaintiff had allegedly conspired with various of the defendant broker's employees to extend credit, where the defendant sold the securities as soon as it discovered the illegality, and where the employees were not acting within the scope of their employment or apparent authority in granting the credit. Serzysko v. Chase Manhattan Bank, 290 F. Supp. 74 (SDNY 1968), aff'd mem. 409 F.2d 1360 (2 Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218 (1969) involved material and deceptive misstatements of fact on the part of the plaintiff investor at

the time he secured the credit, as to the purpose for which he intended to use it. In Bronner v. Goldman, 361 F.2d 759 (1 Cir.), cert. denied, 385 U.S. 933, 87 S.Ct. 295, 17 L.Ed.2d 214 (1966), the court found that the defendant lender had not violated the margin requirements, so that the court did not reach the question of plaintiff's right to recover any damages he could show he suffered because of a violation.

10. See Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (SDNY 1968), aff'd mem. 409 F.2d 1360 (2 Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218 (1969) and Moscarelli v. Stamm, 288 F.Supp. 453 (ED NY 1968), both discussed *supra* note 9.

failure to sell the bonds on time which produced this financial difficulty on the part of plaintiff, for if the Lionel bonds, at least, had been sold seven days after their purchase date they would have yielded a gain rather than a loss. Thus if plaintiff did waive any of his rights, he appears to have done so under financial pressures directly resulting from defendant's violation of Regulation T.

■ Finally, even if defendant could not have sold the bonds and if plaintiff were not induced to sign the stipulation because of any financial pressure, it would nonetheless contravene public policy to give the stipulation conclusory effect. Section 29(a) of the Securities Exchange Act holds void any stipulation obligating a party to waive compliance with the Act. Although the lower court held that waivers of rights under the Act may be given effect if the waivers occur after the commencement of suit, the cases cited only stand for the proposition that the remedial right of access to the courts after an active controversy has arisen can be waived knowingly in favor of arbitration. Here it is difficult to say that Pearlstein's waiver was knowing, given the apparent lack of any inducement to give up his rights other than financial pressure. But if the waiver were knowing, it would not secure some desirable end such as arbitration, easily compatible with the broad purpose of the Act, but would instead serve only to legalize the very extension of credit which the margin requirements seek to prevent and which suits such as this one serve to discipline. Indeed, brokers could routinely extend credit beyond margin simply by delivering bonds to third-party lenders before they were paid for by the customer, and then immediately commencing suit against the customer for the difference, obtaining a waiver in return for a stay of judgment. Such a possibility clearly militates against any bending of the language of Section 29(a) to accommodate the stipulations here involved.

■ We now turn to defendant's claim, concurred in by the lower court, that plaintiff's action regarding the AMF bonds is barred by the *res judicata* effect of the consent judgment entered in the New York court February 8, 1962. Defendant argues and the district judge held that Pearlstein could have raised the violation of federal law as a defense in that action, and his failure to do so must preclude this suit. Cf., e. g., Stuyvesant Ins. Co. v. Dean Constr. Co., 254 F.Supp. 102 (S.D.N.Y. 1966), aff'd mem. sub nom. Stuyvesant Ins. Co. v. Kelly, 382 F.2d 991 (2 Cir. 1967).

Pearlstein did attempt to raise his federal issue in the state court by means of a motion to reopen the judgment after its entry. The New York Supreme Court, per Hecht, J., denied this motion, observing only that "The defendant [Pearlstein] has submitted no substantial reason to set aside the judgment. His remedy is by way of the independent action which he states has been commenced in the federal court."

The confession of judgment signed by Pearlstein in the AMF transaction was invalid for the reasons just discussed. The doctrine of *res judicata* has in the past been held subordinate to principles of public policy, see, e. g., Spilker v. Hankin, 188 F.2d 35 (D.C.Cir. 1951); Denver Bldg. & Constr. Trades Council v. NLRB, 87 U.S.App.D.C. 293, 186 F.2d 326 (1950), rev'd on other grounds, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Here, the same arguments which make the original confession of judgment invalid apply with equal strength in favor of refusing to bar the instant suit because of a judgment entered pursuant to that agreement. Cf. Donald F. Duncan, Inc. v. Royal Tops Mfg. Co., 343 F.2d 655 (7 Cir. 1965), holding that a consent judgment obtained by fraud or mutual mistake cannot be used to invoke *res judicata*.

It could be argued by defendant that even though the New York judgment was voidable, plaintiff's failure to ap-

peal Judge Hecht's refusal to reopen the judgment does operate as *res judicata* and precludes him from raising the same arguments in another court. However, we do not view the New York judgment as affecting the merits of the federal controversy now before us. Although we agree with the lower court that Judge Hecht's dismissal of plaintiff's motion to reopen the suit does not by its language compel the conclusion that the suit was dismissed for lack of jurisdiction, it certainly is indicative of that determination, and we so hold. New York courts have held that federal law may serve as a defense to a state claim but may not be utilized as the basis for an affirmative recovery.[11] Because federal law indicates a securities buyer's liability for the purchase price is not expunged by subsequent margin violations,[12] it appears that Pearlstein's recovery from his broker for margin violations would have to assume the form of a setoff or counterclaim to the broker's claim for the purchase price; this would be the sort of affirmative recovery under federal law which New York courts will not entertain.[13]

We conclude that jurisdictional grounds constitute the reason for the dismissal of Pearlstein's motion to reopen the judgment. It is therefore difficult to see why Pearlstein's suit should be barred in the very federal courts which the New York court recommended to him when it overruled his motion. Normally, a denial of jurisdiction by one court will not preclude consideration of the merits by a second court which does have jurisdiction, see, e. g., Smith v. McNeal, 109 U.S. 426, 3 S.Ct. 319, 27 L. Ed. 986 (1883). And as Mr. Justice Rutledge stated in dissent in Angel v. Bullington, 330 U.S. 183, 204, 67 S.Ct. 657, 91 L.Ed. 832 (1947), a point not contradicted by the majority in that case, the policy favoring *res judicata* has never been so strong

"*  *  * that the matter is ended simply by showing that a party has had some chance. however slight, in a previous litigation to secure a favorable decision.

If this were the law every case where a party takes a nonsuit or a dismissal expressly for the purpose of starting over again would be a final and conclusive determination against him. I know of no jurisdiction where the law has been so harsh. Nor do I think it should be in this one."[14]

---

11. See Standardbred Owners Ass'n, Inc. v. Yonkers Raceway, Inc., 35 Misc.2d 1081, 232 N.Y.S.2d 346 (Sup.Ct. 1962), aff'd mem. 20 A.D.2d 628, 245 N.Y.S.2d 956 (App.Div. 1963); Remington Rand, Inc. v. International Bus. Mach. Corp., 167 Misc. 108, 3 N.Y.S.2d 515 (Sup.Ct. 1937), and cases cited therein at 3 N.Y.S.2d 522.

12. As pointed out in note 9 *supra*, Irving Weis & Co. v. Offenberger, 31 Misc.2d 628, 220 N.Y.S.2d 1001 (Mun.Ct. 1961); E. F. Hutton & Co. v. Weinberg, 1961–64 CCH Sec.L.Rep. ¶ 91.332 (Sup.Ct. N.Y. 1964); and Billings Associates, Inc. v. Bashaw, 27 A.D.2d 124, 276 N.Y.S.2d 446 (1967) all dealt with the question whether a violation of federal margin requirements by the broker relieved the customer of his obligation to pay for the bonds at all. The cases held that the customer must pay absent deliberate inducement by the broker to make an illegal purchase. Pearlstein, however, does not seek in this case to challenge his liability for the original purchase price by any such allegation which would have

been available to him in the New York Court.

13. It is perhaps possible that New York law would permit the assertion of federal law as a defense in this case by holding that title to the bonds vested in Scudder & German after the passage of seven days from date of purchase, so that the broker's claim would be limited to its damages and not to the purchase price of the bonds, but we find no precedent that would appear to support this view of New York law.

14. It might be argued that Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L. Ed. 832 (1947) does impart *res judicata* effect to the New York judgment here concerned, but the case is readily distinguishable. There the Court held that a state court ruling on the jurisdiction of state courts was in fact a ruling on substantive law, applicable to federal courts in that same state through Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), but as the Court

Accordingly, we conclude that Pearlstein's suit here is not barred by any prior adjudication elsewhere.

One point remains for consideration: Pearlstein's assertion that defendant's conduct in this case amounted to fraud. Plaintiff asserts that defendant had not actually acquired the AMF bonds which it was to sell plaintiff from its short position until well after the settlement date, and that defendant was thereby enabled to speculate on the price of the bonds without actually committing its own money. We do not understand how defendant actually benefited from this delay in acquiring the bonds, nor how the delay especially ·damaged the plaintiff. In any event, we find it quite unnecessary to make any determination with reference to this assertion.

Accordingly we reverse and remand to the district court to determine the proper measure and amount of damages. We leave open the question whether defendant's liability for the bonds' decline in price ended when they were sold by the bank or was terminated at some earlier· date.

FRIENDLY, Circuit Judge (dissenting):

This case illustrates the need for putting some brakes on the onrush of civil obligation for violation of the securities laws if that doctrine is to be an instrument of justice rather than the opposite. With all respect, the scholarly opinion of my brother Waterman seems to me to reach a conclusion that shocks the conscience and wars with common sense. Apart from the unfairness of the result on the facts of this case, press reports

of "backroom troubles" of many brokerage houses and the sharp decline in security prices could give the decision far-reaching consequences.

Although the opinion's statement of facts is accurate as far as it goes, a somewhat fuller narrative is needed to place the matter in proper setting: Plaintiff Pearlstein was a practicing lawyer from 1936 to 1953. Since 1956, his time has been spent in investment activity and unsuccessful attempts at free-lance writing. Before opening an account with Scudder & German on February 20, 1961, he had accounts with four other brokerage firms and had engaged in extensive convertible bond transactions. He financed these by having the broker arrange bank loans for a large portion of the cost, as the law then permitted.[1] The convertible bonds were pledged as collateral, and Pearlstein paid cash for the balance.

Pearlstein's first transactions with Scudder & German were carried out in accordance with this practice and with applicable regulations. On February 20, 1961, he purchased 20 Richfield convertible bonds and 20 Phillips Petroleum convertible bonds for $52,509, borrowed $42,000 on them as collateral, and paid the balance of $10,509 on February 27, 1961, the settlement date. On March 6, he sold the Phillips convertibles for $24,599. He used $20,000 of this to reduce the bank loan and obtain the Phillips bonds and left the balance in his account.

On the same day Pearlstein purchased $50,000 principal amount of Lionel convertible bonds for $59,625. While there is a dispute whether defendant recom-

---

pointed out, 330 U.S. at 192, 67 S.Ct. at 662, "Of course, where resort is had to a federal court not on grounds of diversity of citizenship but because a federal right is claimed, the limitations upon the courts of a State do not control a federal court sitting in the State."

1. The majority's suggestion, not advanced by the plaintiff, that in 1961 a broker could not legitimately arrange a bank loan for more than 30% of the value of securities ignores the fact that a broker

arranging for a bank subject to Regulation U to extend credit on registered securities is not limited by the conditions on which he himself could make the loan. 12 C.F.R. § 221.3(t), 33 Fed.Reg. 2705 (1968). The margin requirements of Regulation U applied to loans on convertible bonds only after the conversion privilege had been exercised. See 24 Fed. Reg. 3867–68 (1959). No doubt it was this very liberality that attracted Pearlstein, as it did many others, to speculation in convertible bonds.

mended against the purchase, Pearlstein does not maintain that the broker encouraged it in any way. A $48,000 bank loan was arranged, and plaintiff was obligated to pay the additional $7027 above the balance in his account by March 10. The next day, March 7, he informed defendant that he wanted to purchase $100,000 of American Machine & Foundry convertibles on a when-issued basis. Defendant not merely recommended against this but reinforced its advice by telling Pearlstein it was selling the bonds short. When Pearlstein insisted on going forward, he agreed that defendant would make a short sale to him at the price next recorded on the ticker, *viz.*, 150. At his request defendant investigated bank financing and told him this could be procured to the extent of 80%. The difference would have to be paid when the bonds were issued, to wit, March 23, if Pearlstein had not sold them by that time.

On March 8, Pearlstein advised defendant that he was being hospitalized for an operation. Scudder testified that he advised Pearlstein to sell his securities, which could have been done at a profit, and avoid concern. Pearlstein declined, and entered the hospital that afternoon. Next day, from the hospital, he ordered defendant to sell 50 of the AMF bonds at 155, but that price could not be obtained. He left the hospital on March 31 but on April 9 was brought back on an emergency basis. He underwent operations on April 10, 13 and 20, and was in danger of losing his leg and, indeed, his life. He was not discharged until June 10. Meanwhile the date fixed by Regulation T for payment of the Lionel bonds occurred on March 15 and that

for payment of the AMF bonds on April 4.

Defendant did what it could to obtain payment, short of closing out the transactions, which it had every reason to think the sick man did not want. On April 5 it received payment of $48,000 from a bank on account of the Lionel bonds and delivered them as collateral. Unable to communicate directly with Pearlstein, it called Earle, his customer's man at Dean Witter & Co., where he had his chief stock account, and his mother and sister. Earle promised payment several times but this never materialized; he conveyed no suggestion that Pearlstein wished the bonds to be sold.[2] During May, Earle obtained Pearlstein's signature in the hospital to a $110,000 note for the AMF bonds. However, as a result of Pearlstein's failure to pay the balance of $40,083, this was not consummated. On two occasions during May defendant wrote letters demanding payment on the AMF bonds. There being no response, it placed the collection in the hands of counsel. On plaintiff's discharge from the hospital, he obtained legal advice and consulted the SEC, the New York Stock Exchange, and the NASD. After this he voluntarily entered into the settlements outlined by my brother Waterman. At no time did he indicate any desire that defendants sell the bonds—indeed, he specifically requested additional time to pay his debts. He now asks that, because of defendant's having indulged his desire to retain his securities, it should pay him for the depreciation of the AMF bonds until their sale in May 1962 and of the Lionel bonds until their sale in April 1963, in a total amount of $85,466, plus many years interest.[3]

2. Pearlstein admitted that on March 17 Earle informed him of defendant's recommendation for sale. The Lionel bonds could then have been sold at a profit. The AMF bonds ranged between a high of 150 and a low of 147½. Pearlstein could have sold the Lionel bonds at a profit until mid-June; the AMF bonds again sold over 150 on seven trading days in April.

3. Although the majority leaves open whether defendant's liability for depreciation of the bonds may have ended at an earlier date, it suggests no principle to aid the district court in making this determination. At the very least it should be made clear that defendant has no liability for depreciation of the Lionel bonds after it had been fully paid. In saying this I do not mean to imply that an ear-

It is common ground that defendant violated § 7(c) and Regulation T and thereby subjected itself to the possibility of discipline and even of criminal penalties, although those in charge of such matters evidently decided against doing anything. I recognize also that violations of these provisions may give rise to civil liability in appropriate cases, under any of several theories. See 5 Loss, Securities Regulation 3299–304 (1969). But this is not an appropriate case.

Regardless of the theory under which it is sought to establish civil liability, the starting point for discussion is whether imposition of such liability will further the purposes behind the statute and the regulation. It is thus desirable to begin by examining just what the purposes of § 7(c) were.

The legislative history of that section [4] affords scant evidence that protection of the investor loomed at all large in the Congressional mind. Although passages in the Senate hearings and a later Senate report indicate that an important purpose of the Senate Bill was "to protect the margin purchaser by making it impossible for him to buy securities on too thin a margin," the upper house was considering a bill that placed the administration of the credit requirements in the same agency, then the Federal Trade Commission, that was to enforce the rest of the Securities Exchange Act. The change, initiated by the House of Representatives and concurred in by the Senate, whereby determination of allowable credit was placed in the Federal Reserve Board, has been said to demonstrate "that concern for the investor was wholly subordinated to the achievement of macro-economic objectives." [5] In fact, the report of the House Committee, H.R.Rep.No.1383, 73d Cong., 2d Sess. 8 (1934), stated:

The main purpose of these margin provisions * * * is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a by-product of the main purpose.

The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-cash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry and agriculture, were drained by far higher rates into security loans and the New York call market.

While it thus may be wrong to say that concern for the investor was "wholly subordinated" to the effect of excessive credit on the economy, the history surely does not indicate a Congressional desire that the courts should engage in an all-out effort to utilize § 7(c) to protect investors against themselves, no matter how offensive the result. [6]

With deference to my brother Waterman's contrary view, I doubt whether permitting the customer to shift the risk of market decline to the broker is generally either necessary or desirable as a means of furthering the primary purpose of § 7(c). Occasional and isolated violations of Regulation T do not threaten to cause a significant alteration in the allocation of credit in the economy;

---

lier cut-off might not be appropriate even on the majority's view.

4. A helpful Note, Federal Margin Requirements as a Basis for Civil Liability, 66 Colum.L.Rev. 1462, 1467–71 (1966), gives the references for the developments cited in the following discussion.

5. *Id.* at 1469.

6. The dominating fiscal purpose of § 7(c) is further shown by a ruling of the Federal Reserve Board that the creditor may not accept payment even if this is tendered promptly after the 7–day period. 1940 Fed.Res.Bull. 773.

only widespread or repeated violations would pose a danger. But it is in just such situations that we may confidently expect application of the administrative and criminal sanctions provided by the Act. The economic purpose behind § 7(c) thus causes the provision to differ from those portions of the securities acts more directly aimed at protection of investors. With misleading proxy statements, for instance, one violation does threaten the purpose of the Act *pro tanto*, and since the SEC cannot catch all such violations before the fact, a privately imposed sanction, whether before or after, is appropriate. See J. I. Case Co. v. Borak, 377 U.S. 426, 431–435, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 381–385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). So also in regard to alleged derelictions by directors of investment companies, Brown v. Bullock, 294 F.2d 415 (2 Cir. 1961), and still more obviously with respect to the anti-fraud provisions of the securities laws.

Even assuming that the purpose of § 7(c) would be served by a degree of private enforcement, I question whether the majority's free-wheeling approach will have the desired effect. As a result of it, speculators will be in a position to place all the risk of market fluctuations on their brokers, if only the customer's persuasion or the broker's negligence causes the latter to fail in carrying out Regulation T to the letter. Any deterrent effect of threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, under the majority's view, is placed in the enviable position of "heads-I-win tails-you-lose."[7] For these reasons, and for those given in Judge

Graven's opinion in Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968), which we affirmed "in all respects," 409 F.2d 1360, cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969), I would not find the decision under the anti-trust laws in Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), to be truly pertinent even if there had been more of a consensus among the Justices than there was.

The majority's reason for imposing civil liability thus fails, and I see no other supporting rationale to sustain the result reached in this case. To be sure, it may be proper in some instances to impose civil liability in furtherance of the subsidiary purpose of § 7(c), protection of the innocent "lamb" attracted to speculation by the possibility of large profits with low capital investment. That was the situation envisioned in the dictum in Smith v. Baer, 237 F.2d 79, 87–88 (2 Cir. 1956), see also Junger v. Hertz, Neumark & Warner, 426 F.2d 805 (2 Cir. 1970), both affirming judgments for the defendants.[8] Pearlstein, an experienced speculator, was no lamb, and the trial judge specifically found that he was not induced to enter into the transactions by any expectation that defendant would be slow in selling him out if he were to default in payment.

A view similar to that advocated in this opinion was taken in Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 88–90 (S.D.N.Y.1968), aff'd mem., 409 F.2d 1360 (2 Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218 (1969), which the majority cites as somehow opposing recognition of the plaintiff's fault as a defense in cases of this sort, and in Judge Bartels' thoughtful opinion in Moscarelli v. Stamm, 288 F.Supp. 453, 458–460 (E.D.

---

7. See Comment, Securities Exchange Act of 1934—Civil Remedies Based upon Illegal Extension of Credit in Violation of Regulation T, 64 Mich.L.Rev. 940, 953–55 (1963).

8. As Professor Loss has observed, many of the *nisi prius* decisions relied on by the

plaintiff and the majority have simply refused to dismiss a complaint containing adequate allegations of causation and have postponed that issue until trial. 5 Securities Regulation 3308 (1969). There have been few appellate decisions, indeed none that is in any way controlling here.

N.Y.1968), also cited by the majority, fn. 7. I would follow the lead of these cases and deny recovery on the theory of an implied cause of action.

Although the majority does not reach the issue, I would reach the same result if liability were here sought to be justified under § 29(b) of the Securities Exchange Act. That section provides in pertinent part that "Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract * * * the performance of which involves the violation of, or the continuance of any relationship in violation of, any provision of this title or any rule or regulation thereunder, shall be void * * *." as regards the rights of violators. Here the contract was not in violation of any provision of the statute or any rule or regulation; its performance would not have involved any violation if Pearlstein had done as he was obligated; and the court is not here asked to enforce anything that constitutes a violation. Contrast Kaiser–Frazer Corp. v. Otis & Co., 195 F.2d 838 (2 Cir.), cert. denied, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1962). Despite the Draconian language, § 29(b) does not provide a pat legislative formula for solving every case in which a contract and a violation concur. Rather it was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction. See D. R. Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U.S. 165, 174–175, 35 S.Ct. 398, 59 L.Ed. 520 (1915). There has been a conspicuous lack of judicial enthusiasm for the doctrine thus incorporated when there has been performance by the violator; the reasons are clearly set forth in Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 752–757, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), and Kelly v. Kosuga, 358 U.S. 516, 519–521, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

Pearlstein's claim for restitution based on § 29(b) is, if anything, even less attractive. Courts cannot recall too often Lord Mansfield's observation that the action for money had and received "is the most favourable way in which he [the defendant] can be sued" since he "may defend himself by every thing which shews that the plaintiff, *ex aequo & bono*, is not entitled to the whole of his demand, or to any part of it." Moses v. Macferlan, 2 Burr, 1005, 1010, 97 Eng.Rep. 676, 679 (K.B. 1760). Equity and justice are qualities that Pearlstein's claim conspicuously lacks. He bought the bonds against defendant's advice, refused to sell them on its urging, remained silent when defendant was pressing for payment, and settled his liability after having had legal advice. Equity would leave the loss where it lies.

I would therefore affirm the judgment dismissing the complaint, without reaching the grounds relied on by the district court.