**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**Securities Investor Protection Corporation, Applicant,**

v.

**PACKER, WILBUR & CO., INC., et al., Defendants.**

**No. 71 Civ. 1385.**

United States District Court, S. D. New York.

June 28, 1973.

Gold, Farrell & Marks, New York City, for Trustee; Martin R. Gold, New York City, of counsel.

Shearman & Sterling, New York City, for Coggeshall & Hicks, Inc.

Feldesman & D'Atri, New York City, for Effrem Arenstein.

Theodore H. Focht, Washington, D. C., for Securities Investor Protection Corp., Michael E. Don, Washington, D. C., of counsel.

## OPINION

COOPER, District Judge.

### I. INTRODUCTION

We are asked to deny to a registered broker-dealer and to an active securities trader, each claiming financial losses resulting from a stock transaction between them, the legal right to reimbursement out of the funds administered by the Securities Investor Protection Corporation (SIPC) as provided by the Securities Investor Protection Act of 1970 (15 U. S.C. § 78aaa–78iii). The application before us is by the Trustee of Packer Wilbur & Co., Inc. (Packer Wilbur) ; the active securities trader is Effram Arenstein (Arenstein) ; Coggeshall & Hicks, Inc. (Coggeshall), the registered broker-dealer. The application has legal merit; we uphold it.

The claims herein arise from the same transaction. On February 3, 1971, Arenstein, a customer of both Coggeshall and Packer Wilbur, instructed Coggeshall to purchase two thousand (2,000) shares of Syntex common stock. The purchase was effected at a net price of $90,933.82, settlement date February 10. Arenstein did not have sufficient funds in his Coggeshall account to cover the cost of the securities.

Three days prior to settlement date, February 8, 1971, Arenstein instructed Coggeshall to deliver 2,000 shares of Syntex against payment to Packer Wilbur. Coggeshall delivered the shares, receiving from Packer Wilbur two checks payable to its order aggregating $90,933.82. The checks were dishonored upon presentment to the bank because of insufficient funds. To date they have not been paid. (See Trustee's Memorandum of November 22, 1972, p. 2.)

On the same date (February 8), Arenstein instructed Packer Wilbur to sell 2,000 shares of Syntex. At that time Arenstein did not have any Syntex stock in his Packer Wilbur account and did not own any. (See Trustee's Memorandum, supra at p. 2.) Packer Wilbur, having obtained possession of the 2,000 shares of stock, resold the same for $94,101.71.

Coggeshall commenced an action against Packer Wilbur for the amount due on the dishonored checks. This action was stayed by order of this Court upon appointment of the Trustee as Receiver for Packer Wilbur on June 21, 1971. Thereupon Arenstein and Coggeshall filed their respective claims which we now dispose of.[1]

### II. THE ACT

The Securities Investor Protection Act of 1970 was enacted to stem the growing loss of confidence of public investors in the ability of the brokerage industry to protect customer accounts and generally strengthen the financial responsibility of broker-dealers so as to thereby eliminate, to the maximum extent possible, risks which lead to customer loss. Moreover, the Act seeks to insulate the securities market from any domino effect which may result from the failure of a brokerage house. Senate Report No. 1218. House Report No. 1613, 91st Cong., 2nd Sess. (1970). See also Securities Investor Protection Corp. v. Charisma Securities Corp., 352 F. Supp. 302 (S.D.N.Y.1972).

To effect its purpose, the Act established a fund created from mandatory assessments of all broker-dealers, to be utilized for the purpose of reimbursing customers who incur losses at the hands of insolvent brokers. The fund is administered by the Securities Investor Protection Corp., a nonprofit corporation whose members consist of all broker-dealers and members of national securities exchanges.

---

1. We base our determination solely on the papers before us. An evidentiary hearing is neither required nor has one been requested by the litigants.

■ Upon determination that a broker is in danger of insolvency, SIPC is authorized to apply to the Court for an adjudication that the customers of the allegedly insolvent broker should be afforded the protection of the Act. See SIPC v. Charisma Securities Corp., supra. On June 21, 1971, this Court, upon such an application, appointed the Trustee, the movant herein, pursuant to Section 5(b)(3) of the Act. 15 U.S.C. § 78eee(b)(3).

## III. ARENSTEIN'S CLAIM

Arenstein contends that his claim against Packer Wilbur should be recognized as a valid claim upon the "single and separate fund" established pursuant to the Act. 1970 Act, § 6(c)(2)(B), (f); 15 U.S.C. § 78fff(c)(2)(B), (f). Arenstein concedes that to the extent that Coggeshall's claim is allowed, his claim should be reduced accordingly. We do not agree.

We find from the facts aforementioned that Arenstein was attempting to effect a purchase and sale of stock and realize a profit thereon without any cash investment. If the transaction had been successfully completed, Coggeshall would have received payment for the stock from Packer Wilbur, leaving a zero balance in his Coggeshall account; Packer Wilbur would have completed the sale, leaving Arenstein's net profit of $3,269.-82 in his Packer Wilbur account.

■■ Section 220.4(c) of the Federal Reserve·Board regulations (hereafter "Regulation T"), promulgated pursuant to the Exchange Act of 1934, 15 U.S.C. § 78g, provides:

"(c)(1) In a special cash account, a creditor may effect for or with any customer bona fide cash transactions in securities in which the creditor may:

(i) Purchase any security for, or sell any security to, any customer, provided funds sufficient for the purpose are already held in the account or the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment for the security and that the customer does not ·contemplate selling the security prior to making such payment.

(ii) Sell any security for, or purchase any security from, any customer, provided the security is held in the account or the creditor is informed that the customer or his principal owns the security and the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the security is to be promptly deposited in the account."

Accordingly, a customer purchasing a security for a cash account must pay for it immediately or within the period usually required to complete an ordinary securities transaction. Such undertaking is a necessary part of the customer's agreement with the broker-dealer pursuant to Regulation T. 1940 FRB 1172.

■ We find that the transaction at issue violated Regulation T. Arenstein never intended to "promptly make full cash payment" for the securities purchased, and the purchase price has not been tendered to date. (See Trustee's Affidavit, p. 2.) ·His intent was to realize a profit through the purchase and sale of securities with a zero cash investment.

■ Arenstein ·contends that the alleged violations, if any, were inadvertent and should not disqualify him from reimbursement of his loss by SIPC. We find this unacceptable. Arenstein had been an active securities trader for many years. (See Arenstein affidavit, ¶ 4.) He should have been familiar with the margin rules. Moreover, this is not a situation wherein a customer inadvertently failed to tender payment for a stock purchase. Rather, Arenstein consciously sought to avoid his obligation by effecting the purchase and sale through separate brokers.

■■ The Act was intended to protect the innocent, investor. One who engages in a fraudulent transaction cannot

reap the benefits of the Act's intended protection. Thus in A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967) a brokerage firm brought an action against one of its customers for violating the margin rules. The customer had placed purchase orders without intending to pay for the stock if its market value declined by the settlement date. The Court upheld the complaint on the ground that such practices "exacerbate the very evils that the securities laws were designed to prevent." A. T. Brod & Co. v. Perlow, *supra* at 397. See also Surgil v. Kidder Peabody & Co., Inc., 69 Misc.2d 213, 329 N.Y.S.2d 993. While these cases do not interpret the Act presently before us, to allow recovery thereunder for a claim based on the scheme initiated by Arenstein would likewise offend this Act's laudatory objective to reimburse an *innocent* customer for loss sustained.

Arenstein's reliance upon Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1970) is not well founded. The Second Circuit there held that an investor has a private right of action against his broker for violation of the margin regulations, regardless of the investor's sophistication or knowing participation in the transaction. Id. at 1140–1141. Arenstein contends that if a customer's alleged violation of the margin rules does not bar an action against the broker, it should not bar the customer's right to make claim on SIPC. The decision in *Pearlstein* to place absolute liability on broker-dealers rested upon the Court's implicit policy determination that the margin regulations are most effectively enforced by imposing absolute liability upon the broker regardless of the speculator's conduct. See Pearlstein v. Scudder & German: Implied Rights of Action for Violation of Federal Margin Requirements and the Demise of the In Pari Delicto Defense, 66 Northwestern U.L.Rev. 372 (1971); also Federal Margin Requirements as a Basis for Civil Liability, 66 Columbia L.Rev. 1463 (1966).

The instant case, however, does not involve apportionment of liability between broker and customer or any policy determination that one rather than the other should be held liable. Rather, the question before us is whether the overriding purpose of the Act—to reinforce the confidence of investors and strengthen the financial responsibility of the brokerage industry—is best served by prohibiting recovery out of SIPC funds by a customer who wilfully violates the margin rules. In this case, whether or not Coggeshall is permitted reimbursement is of no consequence in determining whether Arenstein's claim should be paid out of SIPC funds.

We conclude that the purpose of the Act is most effectively served by disallowing Arenstein's claim. His conduct went beyond mere lack of knowledge of the margin requirements; it amounted to a wilful misstatement of material facts. Indeed, the pattern in the instant case is more similar to Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968) aff'd 409 F.2d 1360 (2d Cir.) cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) and Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968) wherein the courts held that a speculator's wrongful conduct barred his recovery from a broker in actions under Section 7(c) of the Federal Reserve regulations. See also Aubin v. H. Hentz & Co., 303 F.Supp. 1119 (S.D.Fla.1969).

Our conclusion in this instance is not inconsistent with that in *Pearlstein* wherein the Court distinguished the *Serzysko* and *Moscarelli* decisions as going "beyond knowledge of the margin requirements to concealment or misstatement of material facts," and declined "to follow or to attack these holdings." Pearlstein v. Scudder & German, supra, 429 F.2d at 1142.

Legislation enacted by Congress subsequent to *Pearlstein* lends further support to our conclusion. Title III of the Bank Records and Foreign Transactions Act of 1970 amended section 7 of the Exchange Act of 1934 to prohibit the re-

ceipt of loans by investors in violation of margin regulations. 15 U.S.C. § 78g(f)(1)(1971). Regulation X, 12 C. F.R. § 224 (1972), expressly implements Title III and provides that an investor may not obtain credit unless the loan conforms with the requirements of the other Federal Reserve Regulations, including Regulation T. 12 C.F.R. § 224.2 (1972). See Note: Regulation X and Investor-Lender Margin Violation Disputes, 57 Minn.L.Rev. 208 (1972). The clear import of Regulation X is that Congress was determined not to limit the burden of compliance to brokers alone but rather extended it to customers as well. To allow Arenstein to recover from SIPC would contradict the express intent of Congress.

## IV. COGGESHALL'S CLAIM

 Coggeshall contends that it is entitled to be paid from SIPC funds the full amount of the · dishonored checks drawn on Packer Wilbur as an "open contractual commitment." Section 6(d) of the Act whereunder Coggeshall claims its right to completion provides as follows:

(d) Completion of open contractural commitments.—The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date—

(1) in which a customer had an interest, except those commitments the completion of which the Commission shall have determined by rule or regulation not to be in the public interest, or

(2) in which a customer did not have an interest, to the extent that the Commission shall by rule or regulation have determined the completion of such commitments to be in the public interest.

For the purposes of this subsection (but not for any other purpose of this chapter) (i) the term "customer" means any person other than a broker or dealer, and (ii) a customer shall be deemed to have had an interest in a transaction if a broker participating in the transaction was acting as agent for a customer, or if a dealer participating in the transaction held a customer's order which was to be executed as a part of the transaction. All property at any time received, acquired, or held by or for the account of the debtor (except for cash or securities that are specifically identifiable as the property of particular customers and are not the subject of an open contractual commitment), and all property in the single and separate fund, shall be available to complete open contractual commitments pursuant to this subsection. Securities purchased or cash received by the trustee upon completion of any such commitment shall constitute specifically identifiable property of a customer to the extent that such commitment was completed with property which constituted specifically identifiable property of such customer on the filing date, or was paid or delivered by or for the account of such customer of the debtor or the trustee after the filing date.

15 U.S.C. § 78fff(d).

 We conclude that Coggeshall's claim is without merit. While there is absolutely no evidence that Coggeshall acted in bad faith, its failure to ascertain the nature and objective of Arenstein's scheme constituted clear neglect. Brokers have an affirmative duty to police customer accounts to make certain that margin violations such as transpired here do not occur. Hanly v. S.E. C., 415 F.2d 589 (2d Cir. 1969); Dlugash v. S.E.C., 373 F.2d 107 (2d Cir. 1967); In the Matter of Coburn and Middlebrook, Inc., 37 SEC 583 (1957). As stated above, the primary onus of compliance with the margin requirements is on brokers and not on their customers. See Pearlstein v. Scudder & German, supra; In Re Naftalin & Co., 333 F.Supp. 136 (D.Minn.1971); Ser-

zysko v. Chase Manhattan Bank, supra; Moscarelli v. A. L. Stamm & Co., supra.

Coggeshall's claim for reimbursement must be considered in light of the manifest Congressional policy against excessive credit transactions. Because of this strict prohibition, brokers are held accountable to investors for participating in lending violations, regardless of the latter's conduct. Reimbursement from SIPC funds to a broker who had knowingly or negligently facilitated violation of the margin rules would subvert the policy against excessive credit transactions.

Regulation T provides that a creditor may purchase securities for an account with an insufficient cash balance, provided the purchase is made in:

> reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment for the security and the customer does not contemplate selling the security prior to making such payment.

Federal Reserve Regulation § 220.4(c)(1)(i), set forth in full above. In the instant case, Arenstein directed Coggeshall to purchase the stock absent a sufficient account balance to cover the cost of the transaction. Were this the end of the matter, we might not construe Coggeshall's conduct to constitute negligence.

Where, however, a customer lacking a sufficient cash balance to effect a purchase asks that the stock purchased be delivered to another institution against payment, the possibility of a violation of Regulation T becomes immediately apparent. When Arenstein directed Coggeshall to deliver the stock to Packer Wilbur against payment, Coggeshall was placed on constructive notice that its customer was attempting to realize a profit through the purchase and sale of the stock within the settlement period without making cash payment therefor.

Coggeshall in following Arenstein's directive to deliver the stock to Packer Wilbur against payment without first ascertaining whether he had sufficient cash resources to cover the purchase failed to satisfy its obligation to police its accounts. Such duty exists precisely for the purpose of preventing the violation which occurred herein. Coggeshall's involvement in the overall transaction was sufficiently extensive to put it on notice of its unlawful objective. It is clearly distinguishable from the more common margin violation wherein the broker's only connection is to execute transactions involving stocks purchased on margin. See Junger v. Hertz, Newmark & Warner, 426 F.2d 805 (2d Cir. 1970); Meisel v. New Jersey Trust Co., 218 F.Supp. 274 (S.D.N.Y.1963). See also 5 L. Loss, Securities Regulation 3295 (1969).

Coggeshall violated not only the standard of care dictated by the courts, but also failed to follow the precautionary measures voluntarily instituted by the brokerage enterprise. In fact, a practice has developed therein whereby a firm purchasing securities and delivering them to another institution against payment requests the latter to provide a "Letter of Free Credit." Such letter represents to the purchasing firm that the money delivered does not represent the proceeds of the stock sold. (See Trustee's Memorandum, supra at p. 11.) No such letter was requested by Coggeshall, nor could it have been given, for the money being delivered *did* represent proceeds from the sale of the same stock. Had Coggeshall followed the general practice, Arenstein's scheme would have been disclosed and its untenable objective foiled.

While we find no cases in point (SIPC legislation is recent), decisions imposing liability upon brokers for similar violations of the margin rules support our conclusion. Thus, in In Re Naftalin, supra, brokerage houses brought involuntary bankruptcy proceedings against a customer alleging his indebtedness to them in connection with a transaction wherein the customer sold short and failed to deliver the securities sold. The

Court held that the brokers did not violate the margin rules in executing the sale because they did not then know that the securities were not in the customer's possession and thus they acted in the good faith belief that the securities would be promptly delivered. However, where after seven days they were not delivered, failure to liquidate the transaction on the eighth day constituted an illegal extension of credit to the customer. In holding the brokers accountable regardless of the customer's conduct, the Court stated:

> It is extremely distasteful to this court to hold that the violation of the federal regulations by members of the industry can be used defensively by a completely and wholly undeserving, sophisticated and knowledgeable customer such as Naftalin. The court concludes, however, that such a holding, as harsh as it may seem, is consonant with the objectives and purposes of the 1934 Securities Exchange Act. Further, had the brokerage houses followed what this court deems to be the clear mandate of the law as evidenced by their own self-designated payment or settlement dates, their losses might well have been less.

In Re Naftalin & Co., supra, 333 F. Supp. at 145.

One criterion set forth by the Act as a test of whether completion should be authorized is a determination by the Securities and Exchange Commission that completion is in the public interest. See Section 6(d). Completion is generally in the public interest since it minimizes the disruption caused by a broker's failure, thus precluding a domino effect produced by such failure. House Report No. 1613, 91st Cong., 2nd Sess. (1970). Experience may show, however, that not all contractual commitments should be completed. Accordingly, the S.E.C. is authorized to prohibit or direct completion of such transactions. See House Report No. 1613, supra.

In determining whether Coggeshall is entitled to completion of its alleged contractual commitment, we must also consider whether the customer's conduct, as well as that of the broker, is such that completion would be in the public interest. We conclude that in this instance it would not. Surely the protection which the Act affords does not include either the designing stock manipulator, whose cunning schemes violate basic good conduct, or the stock broker who indifferently throws to the winds that degree of ordinary care and simple caution imperative in business dealings of any sort in order to avoid harm, even disaster.

## V. CONCLUSION

In conclusion, the 1970 Act requires that liquidation proceedings such as the one presently before us be conducted in accordance with and as though they were pursuant to Chapter X of the Bankruptcy Act. 1970 Act § 6(c)(1); 15 U.S.C. § 78fff(c)(1). It is well settled that the general principles of equity govern bankruptcy proceedings. Accordingly, we have carefully assessed those considerations of fairness that have been the traditional concern of equity courts. Based on the foregoing we are constrained to and do conclude that the protection of the innocent investor and the restoration of his confidence in the brokerage industry (the avowed purpose of the 1970 Act) compel us to deny the claims of Arenstein and Coggeshall for reimbursement by the trustee out of SIPC funds.[2]

So ordered.

2. Our determination is in accord with that reached by SIPC. (See SIPC Statement in Support of Trustee's Motion dated December 13, 1972.)