498 F.2d 978
 Fed. Sec. L. Rep. P 94,583
SECURITIES AND EXCHANGE COMMISSION, Plaintiff, Securities
Investor Protection Corporation, Applicant-Respondent,
v.
PACKER, WILBUR & CO., INC., et al., Defendants.
 No. 550, Docket 73-2294.
 United States Court of Appeals, Second Circuit.
 Argued March 7, 1974.
Decided May 31, 1974.
 
 Edward J. Boyle, New York City (W. Foster Wollen, Shearman & Sterling, New York City, of counsel), for claimant-appellant Coggeshall & Hicks, Inc.
 Martin R. Gold, New York City (Eric Bregman, Gold, Farrell & Marks, New York City, of counsel), for appellee, trustee for Packer, Wilbur & Co., Inc.
 Michael E. Don, Washington, D.C. (Theodore H. Focht, Gen. Counsel, Wilfred R. Caron, Associate Gen. Counsel, Securities Investor Protection Corp., Washington, D.C., of counsel), for appellee Securities Investor Protection Corp.
 Before MOORE, MANSFIELD and OAKES, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 The failure of a business is an unhappy event for debtor and creditor alike. When the bankrupt is one of the pillars of the financial community, a brokerage firm long identified in the popular mind with stability and redoubtable finance the failure can produce a tremor in financial circles throughout the nation. The near collapse in 1969 of Hayden Stone and the rumors of impending failures of other brokerage houses cast a pall over Wall Street that was reminiscent of its never-to-be-foregotten 'Black Tuesday.' The industry naturally feared that the breakdown of these houses would be attended by a general declain in public confidence in the securities market. Congress soon became concerned for the state of the market and in particular for the plight of the many small investors who fell victim to the economic demise of their brokers. The upshot was a legislative effort to reinforce the flagging confidence in the securities market by providing an extra margin of protection for the small investor. The measure adopted was the Securities Investor Protection Act of 1970 ('SIPA'), 15 U.S.C. 78aaa et seq., which assures a minimum recovery to customers of insolvent brokerage houses from a quasi-public fund. The core provision of SIPA specifies that the Securities Investor Protection Corporation ('SIPC'), a nonprofit corporation consisting of all broker-dealers and members of national securities exchanges, shall advance to the trustee of a bankrupt house up to $50,000 for each customer claiming securities and $20,000 for each customer claiming cash from the brokerage house. 15 U.S.C. 78fff(f)(1). The source of the SIPC fund is the general brokerage community, which pays tithes to SIPC to finance its work. 15 U.S.C. 78ddd. Operation of this machinery is triggered by SIPC's determination that a broker is on the verge of insolvency, whereupon SIPC applies to the district court for an adjudication that the broker's customers are entitled to the protection of SIPA. The present case requires us to define some of the bounds of protection afforded by SIPA and, more particularly, to determine who its beneficiaries may be.
 
 
 2
 Packer, Wilbur & Co., Inc. ('Packer Wilbur') fell upon hard times in 1971. In June of that year a trustee was appointed to liquidate the brokerage house pursuant to the provisions of SIPA. Among those filing claims with the trustee were Effrem Arenstein, an individual investor, and Coggeshall & Hicks, Inc. ('Coggeshall'), a brokerage house that represented Arenstein in a transaction with Packer Wilbur. The particular deal was hardly the paradigm of responsible trading in the securities market. The largest share of the blame seems to rest with Arenstein. On February 3, 1971, he instructed Coggeshall to purchase 2,000 shares of Syntex common stock for his account. Arenstein did not remit payment for the securities. Nor did he have sufficient funds in his special cash account at Coggeshall to cover the purchase price of $90,933.82. Under the Federal Reserve Board's 'Regulation T,' 12 C.F.R. 220.4(c), Coggeshall was permitted to execute the transaction only if it acted in reliance upon Arenstein's agreement that he would make prompt payment for the securities and that he did not contemplate selling the securities prior to making payment.[1]
 
 The Set-up
 
 3
 Events proved that Arenstein was not as good as his word. It appears that Arenstein had from the very outset planned to sell the Syntex stock-- at a profit-- and use the proceeds of that sale to pay Coggeshall for the original purchase.[2] It is a technique known in the trade as a 'free-ride.'
 
 
 4
 Shortly after Coggeshall had purchased the stock for Arenstein's account, Arenstein instructed his other broker, Packer Wilbur, to sell 2,000 shares of Syntex stock for his account with it, which Packer Wilbur did at a sale price of $94,203.10. Armed with this knowledge, Arenstein directed Coggeshall to deliver the Syntex shares which Coggeshall had purchased through it to Packer Wilbur against payment. Arenstein expected Packer Wilbur to pay Coggeshall for the shares with the proceeds of its sale of the same Syntex shares for his account with it. The net result of the transaction would be a $3,269.28 profit in Arenstein's account at Packer Wilbur, wrought without any cash investment by Arenstein.
 
 The Sting
 
 5
 Arenstein's scheme failed on the verge of fulfillment. Packer Wilbur must have surmised that Arenstein was attempting a free-ride and seized the opportunity to improve its own lot. When Coggeshall delivered the Syntex stock, Packer Wilbur paid with two faulty checks. Meanwhile it hastened to complete its own sale of the stock to a third party, applying the proceeds to its own account. When Coggeshall discovered the fraud, it stood with the dishonored checks in its own hands. Meanwhile the Syntex stock had passed into the hands of a bona fide purchaser. Coggeshall sued Packer Wilbur on the dishonored checks. It preserved its options, however, by filing suit against Arenstein as well.
 
 
 6
 Shortly thereafter Packer Wilbur went under and a SIPC trustee was appointed for it. Coggeshall and Arenstein lodged separate claims in the ensuing liquidation. Coggeshall sought reimbursement from SIPC in the amount of $90,933.82 on the theory that the checks represented an open contractual commitment of Packer Wilbur that the trustee must complete under 6(d) of the Act.[3] Arenstein argued that as a customer of Packer Wilbur he was entitled to a $50,000 advance on his underlying claim against Packer Wilbur.[4] The district court denied both claims. See 362 F.Supp. 510 (S.D.N.Y.1973). It ruled first that Arenstein, who had misrepresented his intention to make prompt payment, thereby violated the margin rules as well as Rule 10b-5 and should be denied the benefits of the SIPC fund, which was intended to protect innocent investors. As for Coggeshall, the court concluded that it too must be denied any relief under SIPA because its conduct had contributed to a violation of the margin rules. Arenstein has not appealed the adverse determination of his claim; Coggeshall has. Coggeshall strenuously argues its right to recover from SIPC on the ground that it did not in any of its actions violate Regulation T.
 
 
 7
 * The district court rested its decision denying Coggeshall any relief under SIPA on its conclusion that Coggeshall had violated Regulation T, or had breached some duty of due care imposed by that Regulation, when it allowed Arenstein to obtain a free-ride. We disagree.
 
 
 8
 It is undisputed that Coggeshall had acted properly in effecting the purchase of Syntex stock for Arenstein's account. The fault, if any, must lie in the second part of the transaction, i.e., when Coggeshall, at the direction of its customer, delivered the stock to Packer Wilbur against payment. The district court noted that Coggeshall was thereby placed on constructive notice that Arenstein was attempting a free-ride. It implied that Coggeshall should have refused to deliver the stock unless it was assured that Arenstein already had sufficient funds in his Packer Wilbur account to cover the purchase price of the stock. We do not share this view. Section 220.4(c)(8) of Regulation T, which controls this problem for special accounts,[5] does not prohibit free-riding; it simply imposes a foreclosure on other credit or delayed-payment transactions if a free-ride or other premature sale has occurred within the preceding 90 days. Once a free-ride has occurred, to allow the customer delayed payment during the ensuing 90 days, whether or not it eventuates in another free-ride, is to violate 220.4(c)(8). To sell or deliver out unpaid-for stock at a customer's request when a freeze is not in effect, on the other hand, would not appear to violate the section.[6] Since there was no freeze in effect on Arenstein's account at Coggeshall, the latter could legitimately comply with Arenstein's order.[7]
 
 
 9
 Nor was there a requirement that Coggeshall, before making delivery of the shares, obtain a 'Letter of Free Credit' from Packer Wilbur. The practice of obtaining such a letter is an optional one. If followed, it would permit the delivering firm, Coggeshall, to continue Arenstein's account on an unrestricted basis. See Reg. T, 12 C.F.R. 220.4(c)(8). But the only effect of failure to obtain such a letter was to bar use of the account for further free-rides during the ensuing 90-day period.
 
 
 10
 The SEC has apparently espoused this interpretation of Regulation T. In several of its opinions it has suggested that a free-ride does not in and of itself violate the Regulation, but that free-riding does violate the Regulation when it occurs during a freeze period. See, e.g., In the Matter of Coburn and Middlebrook, Inc., 37 S.E.C. 583, 585 n. 6 & 588 n. 14 (1957); In the Matter of Thomson & McKinnon, 35 S.E.C. 451, 458-59 (1953).[8] See also 2 L. Loss, Securities Regulation 1253-54 (1961). Thus there is good reason to believe that Coggeshall did not violate Regulation T when it completed the isolated free-ride transaction for Arenstein. We need not, however, resolve the issue in this case because, even if we concluded that Coggeshall had not violated Regulation T, we would still be compelled to deny its claim against the SIPC fund.
 
 II
 
 11
 Coggeshall is content on appeal to argue that it did not violate Regulation T and then to rest upon the equities of the case. However, arguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of Packer Wilbur, the bankrupt, would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customer. Coggeshall cannot simply rely on its not having violated Regulation T or on the existence of some equities in its favor; its task is to demonstrate that its transaction with Packer Wilbur comes within the protection of the Act. This it cannot do.
 
 
 12
 As the framers of this legislation were at pains to point out, the objective of SIPA was to protect members of the investing public, not brokers.[9] There was no intention to 'bail out' the securities industry. Legislative attention was focused on the small investor who suffered significant losses when a brokerage house collapsed, often because the house had in its last days misappropriated the investor's funds to its own use. SIPA thus looks to requiting investor-customers of the defunct house, see SIPA 6(f)(1)(D), 15 U.S.C. 78fff(f)(1)(D); other broker-dealers can claim the protection of the Act only to the extent that they were acting on behalf of their own customers in dealing with the now defunct firm. Accordingly, 6(d) of SIPA, 15 U.S.C. 78fff(d), Note 3, supra, provides that the SIPC fund will be used to complete open contractual commitments between broker-dealers only when there is a customer interest in the transaction and that 'the term 'customer' means any person other than a broker or dealer.'
 
 
 13
 Coggeshall, invoking 6(d), asserts that its delivery of the Syntex stock to Packer Wilbur represents an open contractual commitment under that section. However, Coggeshall has failed to rebut two contentions made by SIPC with respect to the 6(d) claim, each of which is fatal to that claim. First, 6(d) (1), under which Coggeshall claims, provides that only those open contractual commitments shall be completed in which a 'customer' had an interest.[10] Here Arenstein, whom Coggeshall champions as the customer, has been denied the status of 'customer' under the Act because, upon purchasing the Syntex shares, he falsely represented in violation of 220.4(c)(1) of Regulation T that he would 'promptly make full cash payment for the security' and that he did 'not contemplate selling the security prior to making such payment.' Thus this is a transaction in which the essential 'customer' interest required by the Act is absent. Nor does this amount merely to an exercise in the niceties of statutory construction. Any recovery obtained by Coggeshall from SIPC would be applied against the $90,933 balance owed to Coggeshall by Arenstein. If Arenstein is to be denied the protection of SIPC in his own right because of his misdeeds, it would hardly serve the cause of statutory consistency to allow Coggeshall to recover on his behalf under another section. The policy as well as the letter of the statute are opposed to Coggeshall's claim.
 
 
 14
 For present purposes the district court's findings, which bar classification of Arenstein as a 'customer,' may be treated as final. He has not appealed the decision of the district court, which held that only innocent customers can claim the special insurance provided by the Act, nor has Coggeshall challenged that determination. Any such challenge would fail, for the district court was correct in concluding that 'one who engages in a fraudulent transaction cannot reap the benefits of the Act's intended protection.' We cannot believe that Congress intended that an active and sophisticated securities investor such as Arenstein, who deliberately engaged in a margin violation, should enjoy the benefits of SIPA.[11]
 
 
 15
 The findings of the district court, furthermore, place Arenstein's fraudulent conduct squarely within the proscription of 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967). Providing assistance under SIPA to such an individual would be a gratuitous, indeed counterproductive, gesture. It would in effect be giving succor under one section of the Securities Exchange Act to a person who violated another section.[12] Such a result is particularly inappropriate when, as in the present case, the relief takes the form of public insurance. It is one thing to allow, as we did in Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971), an investor who benefits from a margin violation to sue his broker for his part in that same violation. It is quite another thing, however, to allow an investor, who deliberately induces a margin violation, to be reimbursed from a quasi-public fund.[13] We permitted the recovery in Pearlstein because the purpose of 7 of the Securities Exchange Act would be better served by allowing the investor to enforce the Act against the broker who bore the responsibility for complying with the margin rules. No comparable rationale exists for justifying a recovery by Arenstein from the SIPC. Congress' intent in providing for reimbursement of investors was to restore confidence in and strengthen the operation of the securities market. These goals are hardly furthered by reimbursing from public funds an individual whose fraudulent activities have tended to weaken the market. See A. T. Brod & Co. v. Perlow, supra, 375 F.2d at 397. Arenstein then should not be permitted the special protection of SIPA. Nor should Coggeshall be permitted that protection in his stead.
 
 
 16
 Coggeshall's claim under 6(d) of SIPA falters on still another ground. Coggeshall maintains that the dishonored checks represent an 'open contractual commitment' within the meaning of 6(d). The legislative history of that section indicates, however, that the framers of SIPA understood the term 'open contractual commitment' to mean a wholly executory contract. When asked why there was no dollar limitation on open contractual commitments in 6(d), as there is on simple equity claims in 6(f), a representative of the SEC replied that in open contractual commitments, as contrasted to partially executed transactions, there would usually be only 'a relatively small' profit or loss 'which need not be taken into account . . ..'[14] The provision obviously envisoned a prospective mutual exchange of consideration with only a net flow of cash from the SIPC. With this cushion the framers saw no need for a dollar limitation.[15]
 
 
 17
 To read 6(d) as encompassing partially executed contracts, as Coggeshall argues, would have the undesired effects of subjecting the SIPC trustee to unlimited obligations and of creating a preference in favor of one investor at the expense of the others. Section 6(d) provides that the assets of the debtor's estate (except those specifically identifiable as those of a particular customer of the debtor) shall be applied to complete the open contractual commitments. When the commitment is wholly executory, the preference is limited to the net flow from the estate. When the commitment is partially executed, however, the drain upon the estate can be absolute and the preference complete. There is nothing to indicate that the framers of the legislation intended to bestow on certain customers of a brokerage house such an extraordinary preference. On the contrary, the legislative history reveals a clear intent to restrict the outflow from the estate. Because we read 6(d) to require the completion of wholly executory contracts only, we just reject Coggeshall's claim.
 
 
 18
 By denying Coggeshall any recovery from SIPC funds, we do not deny it the prospect of any recovery through prosecution of other remedies. Presumably it may (if it has not already done so) assert a claim under 6(c)(2)(B), 15 U.S.C. 78fff(c)(2)(B), against the 'single and separate fund' composed generally of that property held by Packer Wilbur from or for the account of its customers.[16] In addition it may reactivate prosecution of its suit against Arenstein for the purchase price of the Syntex stock which Arenstein has never paid, see A. T. Brod & Co. v. Perlow, supra.[17] Coggeshall has expressed some fear that this route may be foreclosed under Pearlstein by virtue of the district court's finding that it had violated Regulation T through its negligence. We have indicated our reservations about that finding. In any event, having found Arenstein to be outside the protection of SIPA, the court was obliged to deny Coggeshall any recovery on Arenstein's behalf. Coggeshall's claim would have failed regardless of the propriety of its conduct under Regulation T. Since it is thus unnecessary for this court to rule on the district court's finding that Coggeshall had negligently violated the Regulation, that finding should not estop Coggeshall from litigating the issue of its compliance with Regulation T in any action it may decide to pursue against Arenstein. See 1B J. Moore, Federal Practice P0.416(2) at 2232-2233.
 
 
 19
 For the reasons stated the judgment of the district court is affirmed.
 
 
 
 [1]
 12 C.F.R. 220.4(c)(1)(i) provides:
 '(c) Special cash account. (1) In a special cash account, a creditor may effect for or with any customer bona fide cash transactions in securities in which the creditor may:
 '(i) Purchase any security for, or sell any security to, any customer, provided funds sufficient for the purpose are already held in the account or the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment for the security and that the customer does not contemplate selling the security prior to making such payment.'
 The agreement need not be explicit. Coggeshall may assume that a sophisticated and experienced investor, as Arenstein certainly was, knows the requirements of Regulation T and impliedly agrees to its terms when he places an order without immediate payment. See Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 469 F.2d 1166, 1175 (8th Cir. 1972). The record in this case does not indicate whether Arenstein's agreement was explicit or implied.
 
 
 [2]
 Arenstein has not to this day paid Coggeshall for the stock
 
 
 [3]
 Section 6(d) provides in part:
 'Completion of open contractual commitments.-- The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date--
 (1) in which a customer had an interest, except those commitments the completion of which the Commission shall have determined by rule or regulation not to be in the public interest, or
 (2) in which a customer did not have an interest, to the extent that the Commission shall by rule or regulation have determined the completion of such commitments to be in the public interest.' 15 U.S.C. 78fff(d).
 
 
 [4]
 The claims are to a large extent duplicative. The Coggeshall claim, if successful, would recover $90,933 to be applied to Arenstein's account. This would all but satisfy Arenstein's personal claim against Packer Wilbur; only the.$3,269 profit from the free-ride would remain as a possible claim
 
 
 [5]
 Section 220.4(c)(8) provides:
 '(8) Unless funds sufficient for the purpose are already in the account, no security other than an exempted security shall be purchased for, or sold to, any customer in a special cash account with the creditor if any security other than an exempted security has been purchased by such customer in such an account during the 90 days, and then, for any reason whatever, without having been previously paid for in full by the customer, the security has been sold in the account or delivered out to any broker or dealer: Provided, That an appropriate committee of a national securities exchange or a national securities association, on application of the creditor, may authorize the creditor to disregard for the purposes of this subparagraph any given instance of the type therein described in the committee is satisfied that both creditor and customer are acting in good faith and that circumstances warrant such authorization. For the purposes of this subparagraph, the cancellation of a transaction, otherwise than to correct an error, shall be deemed to constitute a sale. The creditor may disregard for the purposes of this subparagraph a sale without prior payment provided full cash payment is received within the period described by subparagraph (2) of this paragraph and the customer has not withdrawn the proceeds of sale on or before the day on which such payment (and also final payment of any check received in that connection) is received. The creditor may so disregard a delivery of a security to another broker or dealer provided such delivery was for deposit into a special cash account which the latter broker or dealer maintains for the same customer and in which account there are already sufficient funds to pay for the security so purchased; and for the purpose of determining in that connection the status of a customer's account at another broker or dealer, a creditor may rely upon a written statement which he accepts in good faith from such other broker or dealer.'
 
 
 [6]
 Of course a broker might violate 220.4(c)(1), even when no freeze was in effect, if when he first purchased the stock he had reason to believe that the customer did not really intend prompt payment. After a customer had effected a series of free-rides or premature sales, a broker would no longer be in a position to rely on the customer's representation that he intends prompt payment
 
 
 [7]
 None of this is to exonerate in any way a customer who deliberately misrepresents his intention of prompt payment. If the bona fide intent of a customer should change after the broker had purchased stock for him, the customer could legitimately direct his broker to sell the stock. The effect, therefore, is a 90-day freeze, not a violation of Regulation T. The case of a customer who initially misrepresents his intention to his broker is different. He violates Regulation X, 12 C.F.R. 224.1, and Rule 10b-5 by making this misrepresentation
 
 
 [8]
 Of course, if we had the benefit of a current pronouncement by the SEC of its view on 220.4(c)(8), we could with more confidence resolve the issue
 
 
 [9]
 Hearings on S. 2348, S. 3988 and S. 3989 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 91st Cong., 2d Sess. 257 (1970)
 This is not to suggest that the brokerage community does not ultimately derive some benefit from SIPA. To the extent that SIPA encourages the investor to stay in the market, it contributes to the well-being of the brokerage community. See 116 Cong.Rec. 39350 (1970) (remarks of Rep.Moss).
 
 
 [10]
 Section 6(d)(2), 15 U.S.C. 78fff(d)(2), provides that the trustee shall complete those open commitments in which there is no customer interest to the extent that the SEC shall by rule or regulation determine that the completion of such commitments would be in the public interest. The SEC has not issued any rule or regulation determining that completion of such commitments would be in the public interest
 
 
 [11]
 There is no indication in the legislative history that Congress ever adverted to the possibility of a securities law violator reaping the rewards of SIPA. Congressional attention appears to have been preempted by a concern for the misdeeds of the brokerage community
 
 
 [12]
 Section 2 of SIPA, 15 U.S.C. 78bbb, provides that it shall be considered an amendment to, and section of, the Securities Exchange Act of 1934
 
 
 [13]
 Of course an investor who unintentionally or inadvertently participated in a margin violation probably would stand on a different footing. It is doubtful whether he would possess the scienter essential to establish a violation of Rule 10b-5. Furthermore, he would not be guilty of a violation of Regulation X, the purpose of which is to prevent investors from 'wilfully and intentionally evading the provisions of the (margin) regulations,' 12 C.F.R. 224.1 (1973). Regulation X specifically provides that:
 '(a) Innocent mistake. An innocent mistake made in good faith by a borrower in connection with the obtaining of a credit shall not be deemed to be a violation of this part (Regulation X) if promptly after discovery of the mistake the borrower takes whatever action is practicable to remedy the noncompliance.'
 
 
 [14]
 Hearings on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 2d Sess. 227 (1970)
 
 
 [15]
 The SEC was more sanguine about the operation of 6(d) than experience appears to have justified. Concerned that the completion of open commitments might seriously erode the SIPC funds, the SEC has recently announced a rule that limits the net cash flow in completing open commitments to $20,000. SEC Securities Investor Protection Act of 1970, Release No. 5 (July 25, 1973)
 
 
 [16]
 A broker-dealer can qualify in his own right as a customer for the limited purpose of claiming against the 'single and separate fund.' See 6(c) (2)(A) and (B), 15 U.S.C. 78fff(c)(2)(A) and (B)
 
 
 [17]
 Should a judgment be obtained against Arenstein in such a suit he, upon satisfying it, would presumably be subrogated to Coggeshall's position as a claimant in the 'single and separate fund' of the Packer Wilbur estate