In re SECURITIES AND EXCHANGE COMMISSION, Plaintiff.

SECURITIES INVESTOR PROTECTION CORPORATION, Applicant,

v.

HAVENER SECURITIES CORP. et al., Defendants.

Bankruptcy No. 72 Civ. 4350.

United States Bankruptcy Court, S. D. New York.

Jan. 22, 1980.

Emmet, Marvin & Martin, New York City, for claimant Fahnestock & Co.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for trustee.

Securities and Exchange Commission, New York City, pro se.

Securities Investor Protection Corp., Washington, D. C., pro se.

## DECISION ON MOTION AND CROSS–MOTION

EDWARD J. RYAN, Bankruptcy Judge.

This liquidation proceeding pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78fff(d), was commenced on October 13, 1972 (the "filing date"). These motions arise out of the disallowance by the trustee of Havener Securities Corp. ("Havener" or the "debtor") of an open contractual commitment claim by a broker-dealer, Fahnestock & Co. ("Fahnestock"), pursuant to Section 6(d) of SIPA. Fahnestock moves for an order directing the trustee to complete its open contractual

commitment with Fahnestock pursuant to Section 6 of SIPA; the trustee cross-moves pursuant to Rules 56 and 11 of the Federal Rules of Civil Procedure and Rules 756 and 911 of the Rules of Bankruptcy Procedure for an order confirming the trustee's determination, dated August 4, 1975, disallowing the Fahnestock claim, and awarding in favor of the trustee the attorneys' fees incurred in connection with both the investigation of Fahnestock's claim and the present cross-motion, upon the grounds that there is no genuine issue of fact to be tried and that Fahnestock's claim has been pursued in bad faith.

On April 5, 1973, Fahnestock filed its claim in its "Statement of Open Contractual Commitment by Brokers and Dealers", alleging that as of the filing date there were contracts outstanding stemming from Havener's alleged agreement on trade date October 6, 1972, to purchase a total of 6,000 shares of the common stock of Power Conversion, Inc. ("PCI"), for an aggregate price of $180,250. On August 4, 1975, the trustee rendered his determination disallowing Fahnestock's claim on the grounds that "the transactions upon which your [Fahnestock's] claim is based were not open contractual commitments within the meaning of Section 6(d) of the Securities Investor Protection Act of 1970 ('Act'), and for the further reason that in connection with said transactions, the activities of you [Fahnestock], JAB Securities Co., Inc. and/or the ultimate customers bar recovery under the Act." Fahnestock served and filed its "Objection to The Determination of Trustee Disallowing Claim of Fahnestock & Co. Under The Securities Investor Protection Act" on September 4, 1975. Discovery and investigation were conducted by both Fahnestock and the trustee prior to the filing of the instant motion and cross-motion. Fahnestock's motion is denied and the trustee's cross-motion is granted.

The mechanics of the trades in PCI stock which are the subject of the instant motions and which are not in dispute are as follows:

On the morning of October 6, 1972, First National City Bank ("FNCB") requested J.A.B. Securities, Inc. ("JAB") to sell 6,300 shares of PCI common stock, an over-the-counter security;

By virtue of six separate orders over the course of approximately two hours, JAB requested Fahnestock to sell 6,000 of these shares;

Fahnestock, in turn, telephoned sell orders aggregating 6,000 shares to Havener with a settlement date of October 16, 1972.

The trustee further alleges the following:

1. JAB was acting as agent for FNCB and Fahnestock was acting as agent for JAB;

2. In requesting JAB to sell the PCI shares, FNCB was acting as agent for William Rodman ("Rodman"), a self-employed securities dealer trading in PCI stock (3,800 shares) and Thomas Zammas ("Zammas") a broker-dealer actively trading PCI stock and a registered representative with C. I. Oren & Co., Inc., a market-maker in PCI (2,500 shares), both admitted participants in a scheme to manipulate the price of PCI stock;

3. No communications with respect to the transaction were received by Fahnestock from FNCB on October 6, 1972;

4. Prior to the filing date on October 9, 1979, Fahnestock was informed by Havener that Havener would not honor the trades in PCI stock for trade date October 6, 1972;

5. Fahnestock refused to confirm the PCI October 6, 1972 trades to JAB, refused to accept delivery of same from JAB, and failed to invoke procedures to close out the trades upon which the claim herein is based;

6. Fahnestock did not know of the interests of FNCB, Rodman or Zammas at the time of the transactions in question; and

7. At all times relevant hereto, Fahnestock was a member of the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"), and JAB was a broker-dealer and also a member of NASD.

Fahnestock, on the other hand:

1. Denies any agency relationship between FNCB and Rodman and Zammas;

2. Maintains that it did acknowledge the October 6, 1972 PCI trades to JAB, did complete the trades and did honor the PCI trades with FNCB;

3. Maintains that the trades were not repudiated prior to the filing date and that Fahnestock acted properly with respect to close-out procedures as an "interjected broker"; and

4. Maintains that it did know of FNCB's interest in the PCI trades on October 6, 1972.

The trustee, joined to some extent by the Securities Investor Protection Corporation ("SIPC"), asserts that the documentary evidence and federal banking law controvert Fahnestock's claim that its ultimate customer was FNCB. He urges that since Fahnestock has the burden of proving a qualified customer interest pursuant to Section 6(d) of SIPA, summary judgment should be granted in favor of the trustee as a result of Fahnestock's inability to prove the asserted customer interest. Furthermore, the trustee contends that summary judgment must be granted because the ultimate beneficiaries of a SIPA recovery would be Zammas and Rodman, neither of whom qualifies for SIPA Section 6(d) protection.

The trustee maintains that as of the filing date, the alleged contractual commitment upon which Fahnestock's claim is founded had been repudiated and/or effectively canceled by Havener and, therefore, Fahnestock's claim must be denied.

In addition, the trustee asserts that Fahnestock's failure to tender the shares in question or to invoke available close-out procedures following the settlement date of the October 6 trades, mandates disallowance of Fahnestock's claim.

The trustee also asserts that Fahnestock's failure to inquire into the essential facts concerning the October 6 trades, coupled with its status as an "interjected broker", should preclude Fahnestock from having its claim satisfied out of public funds.

Finally, the trustee asserts that Fahnestock's demonstrated bad faith in connection with the pursuit of its claim herein provides not only another ground for denying Fahnestock's claim, but also amply justifies imposing upon Fahnestock the trustee's attorneys' fees.

It is the position of Fahnestock that, in connection with the October 6 transaction, Fahnestock was acting on behalf of its customer FNCB at the request of JAB and, therefore, Fahnestock had the requisite customer interest in accordance with Section 6(d) of SIPA.

Furthermore, Fahnestock asserts that its entire claim qualifies for open contractual commitment coverage under SEC Rule S6d–1, which defines those SIPA Section 6(d) open contractual commitments which a SIPA trustee shall complete.

The issues before this court concern the applicability and effect of SIPA, particularly Section 6(d) thereof. SIPA was enacted to protect public customers of securities dealers from the financial instability in the broker-dealer industry by assuring to customers recovery in the event of a broker-dealer insolvency. *SEC v. Kelly, Andrews & Bradley, Inc.*, 385 F.Supp. 948, 950 (S.D.N.Y.1974). To achieve its goal, SIPA established a fund, administered by SIPC, and created from mandatory assessments of all broker-dealers, to be utilized for the purpose of reimbursing customers who incur losses at the hands of insolvent brokers, and whose claims against such brokers are determined by the trustee to be covered by SIPA's provisions. *SEC v. Packer, Wilbur & Co., Inc.*, 362 F.Supp. 510 (S.D.N.Y.1973), aff'd 498 F.2d 978 (2d Cir. 1974); *SEC v. Kelly, Andrews & Bradley, supra.*

Section 6(d) of SIPA requires the trustee to complete all "[open] contractual commitments of the debtor . . . (1) in which a customer had an interest . . ." It further provides that for purposes of subsection 6(d)(1), "(i) the term 'customer' means any person other than a broker or dealer, and (ii) a customer shall be deemed to have had an interest in a transaction if a broker participating in the transaction was

acting as agent for a customer, or if a dealer participating in the transaction held a customer's order which was to be executed as a part of the transaction." In addition to the specific statutory exclusion of brokers and dealers from "customer" status, statutory construction of Section 6(d) had denied SIPA protection to would-be customers guilty of securities law violations. See *SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978 (2d Cir. 1974).

■ Fahnestock's failure to prove a qualified customer interest, pursuant to Section 6(d)(1) of SIPA, mandates the denial of Fahnestock's claim and the granting of summary judgment in favor of the trustee. Clearly, Fahnestock's ultimate customers in connection with the October 6 transaction were Rodman and Zammas. Contrary to SIPC's contention, JAB was not Fahnestock's customer so as to preclude applicability of Section 6(d) of SIPA. It is true that JAB executed orders with Fahnestock on October 6, 1972, for JAB's account with Fahnestock. However, according to *In re Weis Securities, Inc.*, CCH Fed.Sec.L.Rep. ¶ 95,429 (S.D.N.Y.1976), Section 6(d) applies where the claimant's customer is another broker-dealer and the latter's customer is the qualifying customer for Section 6(d) purposes. According to the Court in *Weis*, "The customer interest must be on the claimant's side of the transaction, but I perceive no need for privity between the customer and the broker-dealer claimant . . . . I conclude that *where the ultimate beneficiary of an inter-dealers transaction is a qualified customer, the direct or indirect nature of this connection with the broker-dealer is irrelevant.*" (emphasis added).

■ Documentary evidence establishes that FNCB acted as agent for both Zammas and Rodman, the ultimate customers and beneficial interests behind the October 6, 1972 trades. Fahnestock's, FNCB's and Zammas' prior pleadings in State and Federal litigations asserting that FNCB was acting as agent for Zammas are admissible evidence in the instant action. See, *Glaesman v. Shop-Rite Foods, Inc.*, 438 F.2d 341,

342 (10th Cir. 1971); 4 Wigmore, *Evidence*, § 1066, p. 76 (Chadbourne Rev. 1972). Furthermore, the agency relationship between FNCB and Rodman and Zammas, respectively, is clearly and definitely set forth on the face of the sell orders prepared by FNCB and ratified by Rodman and Zammas when they executed the respective documents. Since FNCB was acting in the capacity of agent for Rodman and Zammas, Fahnestock must look to the latter two persons for any customer interest relevant for Section 6(d) purposes. However, an examination of the status and criminal activities of both Rodman and Zammas serves to disqualify them as "customers" under Section 6(d), and further, mandates that no recovery be allowed Fahnestock since any such recovery would undoubtedly inure to the benefit of Rodman and Zammas. See, *SEC v. Packer, Wilbur & Co., Inc.*, 362 F.Supp. 510, *supra.*

Under the doctrine enunciated in *Packer, Wilbur*, 498 F.2d at 984, supra, Zammas' conviction for securities law violations (*U. S. v. Aiken, Rodman and Zammas*, 74 Crim. 987), as well as his subsequent confession under oath to having participated with Rodman in a scheme to manipulate the market in PCI stock precludes the completion of an allegedly open contract with Fahnestock where the benefit of such a transaction would inure to Zammas. Furthermore, since Zammas was convicted as a self-employed "securities dealer", he is statutorily excepted from customer status under Section 6(d) of SIPA.

Similarly, irrespective of Rodman's alleged involvement in the scheme to manipulate the price of PCI stock, his status as of October 6, 1972, as a broker employed by C. I. Oren & Co., Inc.—a market maker in PCI stock—as a registered representative, provides sufficient basis for denying Rodman customer status under Section 6(d) of SIPA.

This court accepts the trustee's analysis that *SEC v. Equitable Equities, Inc.* (Claim of Herold, Kastor & Gerald ["HKG"]) 72 Civ. 4349, decided December 22, 1975, is factually distinguishable from the instant case, in that in the case at bar it is clear

that FNCB was indisputably acting as the agent of Rodman and Zammas, whereas in *Equitable Equities*, this court determined that HKG was not acting as agent for its customer Zammas. Therefore, the *Equitable Equities* holding concerning the effect on former customers where there is a finding of absence of agency relationship is insufficient to support Fahnestock's present position where there is a finding of agency relationship. In addition, the controlling principle is set forth in *Packer, Wilbur* which denied the protection of SIPA where a recovery from SIPA would ultimately inure to the benefit of one already denied the status of customer in his own right because of his misdeeds. Since a recovery by Fahnestock on its claim herein would benefit Rodman and Zammas to the extent of reducing their respective indebtedness to FNCB, such recovery must be denied.

■ Turning from the question of "customer" status, the debtor had repudiated and canceled its contracts with Fahnestock for good and sufficient legal cause; hence, Fahnestock is not entitled to SIPA protection based on any "open contractual commitment" claim. There simply is no contractual commitment upon which Fahnestock can recover. Both NASD and Section 29(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78cc(b), provide sufficient legal basis for the debtor's cancellation of the October 6 trades. Not only is a broker-dealer entitled to refuse to perform a contract where he honestly and reasonably believes that to perform would perpetuate a fraudulent scheme, but verily a contract which continues a practice in violation of the Act is void. The documentary evidence submitted to this court concerning the suspension of trading in PCI stock on October 9, 1972, due to the possibility of "apparent fraudulent manipulation", coupled with subsequent events (*i. e.,* Zammas' confession on December 15, 1975, to securities fraud in connection with PCI stock) are sufficient to presume an honest and reasonable basis for debtor's refusal to perform the contract. Furthermore, debtor's telephonic communications of October 9, 1972, stating that "they would not honor

the trades (either buys or sells) in Power Conversion, Inc., on trade October 6", based on the possibility of securities law violations, coupled with the October 13 confirmation and the trustee's subsequent denial of Fahnestock's claim, demonstrate debtor's election to treat the October 6 contract as a nullity pursuant to Section 29(b) of the Act, on the grounds that if the contract were performed, it would continue a practice in violation of the Act. Thus, the cancellation and/or voiding of the October 6, 1972 contract between Fahnestock and the debtor precludes the existence of an "open contractual commitment" meriting relief through SIPA under Section 6(d).

■ While this court need not decide the effect of a breach of contract of Section 6(d) protection since it has already determined the contract in issue to have been effectively canceled, the court does note that case law has determined that a debtor's failure to accept stock pursuant to a contract gives rise to a breach of contract claim and renders said contract not wholly executory. See, *SEC v. Kelly, Andrews & Bradley, Inc., supra.* In addition, Section 6(d)'s "open contractual commitments" encompass only those inter-broker agency trades which are wholly executory on the filing date of liquidation proceedings. *SEC v. Packer, Wilbur*, 498 F.2d 978, *supra.* Thus, a broker's refusal to accept stock pursuant to a contract removes such contract from "open contractual commitment" status and thereby from Section 6(d) protection. Although SIPC argues that this result was not the intent of the statute, case law interpretation has held otherwise.

Fahnestock's failure to promptly buy-in or sell-out its alleged open contractual commitment with the debtor provides further support barring Fahnestock's recovery under Section 6(d). SEC Rule S6d–1, 17 C.F.R. § 240.206 d–1, though effective after the commencement of this liquidation proceeding, is nonetheless instructive in determining the definition of "open contractual commitments". See *SEC v. Security Planners*, 416 F.Supp. 762, 766 (D.Mass.1976).

SEC Rule S6d–1 provides, in pertinent part:

§ 240.206d–1 Completion of open contractual commitments.

(a) *Definitions.*

\* \* \* \* \* \*

(3) The term "open contractual commitment" shall mean a failed to receive or a failed to deliver which had a settlement date prior to the filing date and the respective obligations of the parties remained outstanding on the filing date or had a settlement date which occurs on or within five business days subsequent to the filing date:

\* \* \* \* \* \*

(b) It is hereby determined to be "in the public interest," within the meaning of section 6(d)(2) of the Act, for a trustee to complete such open contractual commitments as are specified in paragraph (c) of this section in accordance with the procedures prescribed in this section, \* \* \*.

(c) An open contractual commitment shall be completed if:

\* \* \* \* \* \*

(d)(1) The completion of an open contractual commitment meeting the requirements of paragraph (c) of this section shall be effected only:

(i) By the buy-in or sell-out of the commitment by the other broker or dealer in accordance with the usual trade practices initiated by the other broker or dealer within or promptly upon the expiration of a period of 30 calendar days after settlement date; or

(ii) At the option of the trustee \* \*.

■ The rule mandates that the only way for one other than the trustee of a SIPA debtor to effect the completion of an open contractual commitment consisting of fails to receive or fails to deliver is for the other broker-dealer to promptly buy-in or sell-out the fails. In other words, where the trustee does not exercise his option to close out the fails, the other broker-dealer must promptly buy-in or sell-out the fails in

order for it to be deemed within the public interest for the trustee to complete the open contractual commitment. This analysis of Rule S6d–1 is supported and further explained by SIPA Release No. 5 (CCH) Fed.Sec.L.Rep. ¶ 79,425 (1973). The release states that the purpose of Rule S6d–1 is "to complete only those fails to receive and fails to deliver described in paragraph (a) of the rule which:

(i) arose from a current transaction in which the other broker was acting as an agent for a customer, or the other dealer was acting for a customer in certain narrowly defined principal transactions;

(ii) are not stale as of the filing date;

(iii) *are brought-in, sold-out, or closed by delivery of funds and securities, promptly in accordance with the provisions of the rule* ; and

(iv) are reported promptly to the trustee and supported by appropriate documentation . . . ." (emphasis added).

While noting that a close-out is at the option of the trustee, the Release further states, "The rule provides that it is not in the public interest for the trustee of a SIPC Act debtor to complete open contractual commitments of the debtor consisting of fails to receive and fails to deliver, as defined in the rule, open on the filing date *unless such fails were promptly bought-in or sold-out by the other broker-dealer* and certain reports made to the trustee in accordance with the provisions of the rule." (emphasis added). Thus, the prompt buy-in or sell-out by the other broker-dealer is a substantive prerequisite for the completion of open contractual commitments consisting either of fails to receive or fails to deliver. One of the objectives of Rule S6d–1, according to the Release, is to discourage open fails; therefore, the aforementioned strict requirements of the Rule must be met before an open contractual commitment will be completed. Thus, regardless of the reasons why Fahnestock failed to invoke proper sell-out procedures, the fact remains that Fahnestock's failure to do so effectively bars it from recovery under Section 6(d).

While this court agrees with the trustee that pursuant to New York Stock Exchange Rule 405, Fahnestock should have been more diligent in learning the essential facts of the October 6 trade, we find that since more than enough other grounds exist for denying Fahnestock access to SIPC funds, this court need not make further inquiry into the purpose and effect of the Stock Exchange and/or NASD rules.

While this case is not one in which contempt sanctions are appropriate, the trustee's cross-motion for an award of attorneys' fees incurred in connection with (1) the investigation of Fahnestock's claim and (2) the assertion of this cross-motion is granted. The trustee bases his cross-motion on the grounds that Fahnestock pursued its claim against the debtor in bad faith. The trustee contends that Fahnestock's assertions both in its "Objection to the Determination of the Trustee" and in its instant motion that "the ultimate customer of Fahnestock was First National City Bank which was acting for its own account and not for the account of those persons believed by the trustee to be the ultimate customers" were each made in bad faith since its third-party answer, dated November 8, 1974, in FNCB's federal action (73 Civ. 3157), Fahnestock pleaded, "In connection with and in the course of the alleged sale through Fahnestock of 2,500 shares of Power Conversion, Inc., third-party plaintiffs 'Zammas and Zammas' *and their agents, Citibank and J. A. B. . . .*" (emphasis added). Clearly, prior to the filing of Fahnestock's "Objection to the Determination of the Trustee" and the making of its instant motion, Fahnestock knew, or at least had reason to know, that its representations that FNCB was Fahnestock's ultimate customer were untrue.

 This court's Order, dated February 27, 1975, establishing the review procedure for SIPA claims, coupled with Rule 911(a) of the Rules of Bankruptcy Procedure, warrants the striking of Fahnestock's "Objection To The Determination of Trustee Disallowing Claim of Fahnestock & Co. Under The Securities Protection Act" as "sham and false." Consequently, the trustee's determination disallowing Fahnestock's claim becomes final and binding on Fahnestock. In addition, since, contrary to fact and actual good faith belief, Fahnestock wantonly asserted both prior to filing its claim in the "Objection" and in the present motion, that FNCB acted for its own account and not for those believed by the trustee to be the ultimate customers, Fahnestock acted in bad faith in proceeding against the trustee. This court notes the extensive nature of the investigation conducted by the trustee in connection with Fahnestock's improperly asserted claims and, rather than imposing the trustee's counsel fees on the public funds advanced by SIPC, this court, in the exercise of its discretion, deems it appropriate for Fahnestock to bear the expenses incurred by the trustee. See, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1087 (2d Cir. 1977).

## CONCLUSION

For all of the facts and reasons hereinbefore stated, this court denies Fahnestock's motion and grants the cross-motion of the trustee pursuant to Rules 56 and 11 of the Rules of Civil Procedure, and Rules 756 and 911 of the Rules of Bankruptcy Procedure, confirming the determination of the trustee, dated August 4, 1975, disallowing Fahnestock's claim pursuant to Section 6(d) of SIPA and awarding in favor of the trustee, attorneys' fees incurred in connection with the investigation of Fahnestock's claim and the making of this motion.